**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**MANIYA ALLEN, et al.,**
**Plaintiff,**

**v.**                                                    **Case No. 11-CV-0055**

**AMERICAN CYANAMID et al.,**
**Defendants;**

---

**DIJONAE TRAMMEL,**
**Plaintiff,**

**v.**                                                    **Case No. 14-CV-1423**

**AMERICAN CYANAMID et al.,**
**Defendants;**

---

## DECISION AND ORDER

The plaintiffs in these cases allege they were injured when they ingested paint containing white lead carbonate (WLC) as young children. Defendants produced or sold, or are successors-in-interest to producers or sellers of, WLC. Plaintiffs proceed on Wisconsin's risk-contribution theory of liability which relaxes the causation standard and allows a plaintiff to establish a prima facie case on the basis that a manufacturer produced the type of product that caused harm and thus contributed to the risk of injury to the public. Before me now are several motions for partial summary judgment and for summary judgment.

### I.      SUMMARY JUDGMENT STANDARD

Summary Judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

## II. ANALYSIS

### A. INTERVENING SUPERSEDING CAUSE

Plaintiffs move for summary judgment on defendants' affirmative defense of intervening or superseding cause and ask the court to preclude defendants from arguing that the activities of plaintiffs' parents, caregivers, landlords, and the city of Milwaukee were an intervening or superseding cause of plaintiffs' lead poisoning.

In Wisconsin, the intervening or superseding cause defense is subsumed within the first of the six "public policy" factors by which a court may limit liability even though a jury has found a defendant negligent and determined that the defendant's negligence was cause-in-fact of the plaintiff's damages. Specifically, the first factor asks whether a plaintiff's injury is too remote from a defendant's causal negligence. *Cefalu v. Continental Western Ins. Co.*, 2005 WI App 187, ¶¶20-21 (stating that the "remoteness factor revives the intervening or superseding cause doctrine").

Typically, Wisconsin courts defer analysis of superseding cause and other public policy factors until after trial. *See Thomas ex rel. Gramling v. Mallett*, 2005 WI 129, ¶ 166 n. 54 ("In most cases the better practice is to submit the case to the jury before determining whether the public policy considerations preclude liability."); *Alvarado v. Sersch*, 2003 WI 55, ¶ 20 ("[P]ublic policy factors limiting liability should be considered only after a full resolution of the facts at trial.").

I will comply with the guidance of the Wisconsin Supreme Court and defer my consideration of the intervening or superseding cause defense until after the jury has reached a verdict. Therefore, I will deny plaintiffs' motion for summary judgment on this defense.

## B. ARMSTRONG CONTAINER'S MOTION FOR SUMMARY JUDGMENT

Armstrong Containers ("Armstrong") moves for summary judgment dismissing plaintiffs' claims against Armstrong. It argues that there is no genuine dispute of fact as to whether any WLC produced or sold by John R. MacGregor Company or the MacGregor Lead Company (together, "MacGregor"), Armstrong's predecessors, could reasonably have contributed to plaintiffs' injuries. Specifically, Armstrong argues that plaintiffs' have identified only one brand of paint containing MacGregor WLC, Scotch Laddie paint, as being sold in the Milwaukee market during the relevant time period and that Armstrong's expert, Dr. Brown, has determined none of the paint layers found in plaintiffs' homes contained Scotch Laddie paint.

Plaintiffs argue that, regardless of the validity of Dr. Brown's analysis, this fact is not dispositive because it fails to rule out other brands containing WLC manufactured by MacGregor, such as Enterprise Paint and Armstrong Paint & Varnish. It is irrelevant, plaintiffs argue, that they have not produced evidence that these brands were present in the Milwaukee market during the relevant time because, under *Thomas*, Armstrong bears the burden of proving its product was not sold in Milwaukee.

I agree with the plaintiffs. *Thomas* is clear that once plaintiffs have established their prima facie case, "the burden of proof shifts to each defendant to prove by a preponderance of the evidence that it did not produce or market white lead carbonate

3

either during the relevant time period or in the geographical market where the house is located." 2005 WI 129, ¶ 163. *Thomas* goes on to say that "if relevant records do not exist that can substantiate either defense, we believe that the equities of [white lead carbonate] cases favor placing the consequences on the [Pigment Manufacturers]." *Id.* (internal quotations omitted.) Although Armstrong's expert may have excluded some paint formulas which contained MacGregor WLC, Armstrong has not identified evidence excluding other brands containing MacGregor WLC. Nor has Armstrong pointed to any evidence that that these brands were not sold in Milwaukee. A reasonable jury may therefore conclude that Armstrong has not met its burden of proof on the issue of whether MacGregor WLC could reasonably have contributed to plaintiffs' injuries. Accordingly, I will deny its motion for summary judgment.

### C. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF ARMSTRONG CONTAINERS BEING SUCCESSOR-IN-INTEREST TO MACGREGOR LEAD

In *Burton*, I held that Armstrong was a successor-in-interest to MacGregor Lead. *Burton v. American Cyanamid*, 2018 WL 577917 (E.D. Wis. November 2, 2018). Plaintiffs move for summary judgment on the issue, adopting the briefings filed by the *Burton* plaintiffs, who have the same counsel as the plaintiffs in this case, and citing my previous order on the issue. Armstrong opposes summary judgment and raises new arguments not addressed in my previous ruling.

The background and details of this issue have been thoroughly covered in the relevant order in the *Burton* case and I will not revisit them here. *Id.* For the purposes of this motion, it suffices to say that the issue depends on whether an asset purchase agreement dating to 1983 included an express or implied assumption of unknown

liabilities. I previously held that it did. *Id.* at *5. Because none of the parties raised the issue of choice of law, I applied the substantive law of Wisconsin, the forum state. Armstrong now argues that the agreement should be construed and interpreted under Illinois law. However, Armstrong does not point to any relevant difference between Illinois and Wisconsin law. In fact, Armstrong argues that the relevant "Wisconsin law is substantially similar to Illinois law." "Conflicts rules are appealed to only when a difference in law will make a difference in the outcome." *International Adm'rs, Inc. v. Life Ins. Co. of North Am.*, 753 F.2d 1373, 1376 n.4 (7th Cir. 1985). On issues where there is no disagreement between the states, the law of the forum state is applied. *Id.* Because Armstrong has not identified any disagreements between the applicable laws of Wisconsin and Illinois, the application of the law of the forum state was appropriate.

Armstrong also argues that I incorrectly applied Wisconsin law in my previous order and that the agreement should not be read to include an express or implied assumption of unknown liabilities. It does not cite to any authorities, nor make any new arguments, which I did not consider in my original ruling. I disagree that I incorrectly applied Wisconsin law, and I hold that the agreement did include an express or implied assumption of unknown liabilities for the reasons described in my order in the *Burton* case. *See Burton*, 2018 WL 577917 (E.D. Wis. November 2, 2018)

Finally, Armstrong argues that summary judgment is inappropriate because ambiguity in the contract creates a genuine issue of material fact. Armstrong is correct that, once a contract is determined to be ambiguous, determining the parties intent usually becomes a job for the trier of fact. *See Matthews v. Wis. Energy Corp., Inc.*, 534 F.3d 547, 556 (7th Cir. 2008). However, summary judgment is appropriate where

consideration of extrinsic evidence and the language of the contract permits a trier of fact to come to but one conclusion. *See ConFold Pacific Inc. v Polaris Indus.*, *Inc.*, 433 F.3d 952, 956–57 (7th Cir. 2006); *Continental Cas. Co. v. Northwestern Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). In my original ruling, I explained that Armstrong's proposed interpretation would result in a contract that "would not be a rational business instrument" and that it would be "incredible that a reasonable business would enter into such a contract." *Burton*, 2018 WL 577917 at *5 (E.D. Wis. November 2, 2018) (quotations omitted). In other words, there was only one reasonable interpretation of the contract despite its ambiguity. Because the only reasonable interpretation of the contract is that it included an assumption of unknown liabilities, I conclude that a reasonable trier of fact could not find in favor of Armstrong on this issue and I will grant the motion for partial summary judgment.

### D. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF THE FUNGIBILITY OF WLC

Plaintiffs move for summary judgment on the issue of the fungibility of WLC. I concluded in the *Burton* trial that, under Wisconsin law, WLC is fungible as a matter of law. *Burton v. American Cyanamid*, 341 F.Supp.3d 941, 945 (E.D. Wis. 2018); *see also Burton v. American Cyanamid*, 07-CV-0303, ECF no. 1059. Sherwin-Williams opposes plaintiffs' motion but makes no arguments I did not consider in my original ruling. Therefore, I again conclude that WLC is fungible as a matter of law, for the same reasons explained in the *Burton* case. *Id.* Accordingly, this motion is granted.

### E. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON AFFIRMATIVE DEFENSES

Plaintiffs move for summary judgment against defendants on three affirmative defenses: (1) statute of limitations and statute of repose; (2) constitutional defenses including claims of violations of the Due Process Clause, the Commerce Clause, the Taking Clause, and the First Amendment; and (3) misuse.

Upon agreement of the parties, the defendants' affirmative defenses regarding the statute of limitations and the statute of repose have been withdrawn and this portion of the motion has been denied as moot. ECF no. 1039.

Plaintiffs argue that the Seventh Circuit's decision in *Gibson v. American Cyanamid*, 76 F.3d 600 (7th Cir. 2014) forecloses all constitutional affirmative defenses. Certainly, I am bound by Seventh Circuit precedent, but I am unwilling to pass preemptive judgment on issues that have not yet been raised or briefed. I will deny this portion of the motion.

Finally, in their answers to the complaints in these cases, defendants Sherwin-Williams, Armstrong, and Atlantic Richfield asserted that the plaintiffs' alleged injuries were caused by misuse of the product in question. Plaintiffs have moved for summary judgment on the "affirmative defense of misuse." I considered this question before the *Burton* trial and, although the facts related to each plaintiff differ, the principles are the same. *See Burton v. American Cyanamid*, 341 F.Supp.3d 941, 947-948 (E.D. Wis. 2018). In that case I held, as a matter of law that for the owner or resident of a property to passively allow paint to deteriorate is an eminently foreseeable misuse of paint. *Id.* I also stated I could not find that poor maintenance of paint constituted a "use" of WLC other than "the purpose for which it was intended." *Id*. There is no evidence, then, of

7

misuse as an affirmative defense to liability and that portion of the motion is therefore granted. However, evidence that the landlords or parents unreasonably allowed paint to deteriorate may be considered by the jury in allocating proportional fault. *Id. citing* Wis. JI-CIVIL 3268 ("Us[ing] a product knowing the product was worn out in such a manner as to render the same unsafe" can constitute contributory negligence); *Schuh v. Fox River Tractor Co.*, 63 Wis.2d 728, 741 (1974) (holding that farmer who stood on edge of crop blower while putting up silage was using the crop blower "for its intended purpose," but was not using it reasonably.) Defendants may also rebut plaintiffs' prima facie case by showing that, at the relevant time, they did not know or have reason to know of the risk that children would ingest and be poisoned by negligently maintained paint and the jury may consider evidence of the parents' failure to prevent children from eating paint in the allocation of contributory fault. *See Burton v. American Cyanamid*, 341 F.Supp.3d 941, 947-948 (E.D. Wis. 2018). This motion is denied.

### F. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON FAILURE TO MITIGATE DAMAGES

Each plaintiff claims that his or her ingestion of lead resulted in cognitive injury. Defendants have pleaded the affirmative defense of mitigation of damages in each case. Essentially, defendants argue that the plaintiffs unreasonably failed to pursue available treatments (e.g., psychotherapy, occupational training, or medication) that might have improved the plaintiffs' cognitive functions and behaviors. Each plaintiff has moved for partial summary judgment dismissing this defense.

The Wisconsin law on mitigation of damages in tort actions is as follows: "An injured party is obligated to exercise that care usually exercised by a person of ordinary intelligence and prudence, under the same or similar circumstances; to seek medical or

surgical treatment; and to submit to and undergo recommended surgical or medical treatment, within a reasonable time, which is not hazardous and is reasonably within his means, to minimize his damages." *Lobermeier v. General Telephone Co. of Wisconsin*, 119 Wis. 2d, 129, 149 (1984). Plaintiffs who are minors are still obligated to exercise reasonable care in mitigating their damages: recognizing that parents and caregivers generally make treatment decisions on behalf of minors, the Wisconsin Supreme Court held that

> [i]t is reasonable to expect and require that the child would rely upon his parents' judgment. While the duty to mitigate under these circumstances might devolve on both child and parent, we hold that the standard of reasonableness involved is the adult standard as to what is reasonable in the acceptance or rejection of [elective treatment] to mitigate damages.

*Hargrove v. Peterson*, 65 Wis.2d 118, 125-126 (Wis. 1974).

Regarding plaintiff Latonya Cannon, defendants have adduced evidence that she was prescribed a nineteen day at-home course of oral chelation treatment, but that she completed only five days of the course for "reasons unknown." Defendants have further adduced evidence that, despite a history of attention and anger issues reported by her mother and educators, plaintiff Cannon never sought or received therapy or any other treatment for such issues. I conclude that this evidence is sufficient for a jury to find that Cannon breached her duty to reasonably seek or submit to medical treatment.

Regarding plaintiff D'Angelo Thompson, defendants have adduced evidence that he was diagnosed with Attention-Deficit/Hyperactivity Disorder and that his teachers reported other behavior issues. However, Thompson and his mother have testified that,

except for one instance where he took a dose of prescribed medication, Mr. Thompson has never sought or received medication, therapy, or any other treatment or medical advice concerning these issues. I conclude that this evidence is sufficient for a jury to find that Thompson breached his duty to reasonably seek or submit to medical treatment.

Regarding plaintiff Tyann McHenry, defendants have adduced evidence that her teachers reported that she was exhibiting behavior issues and that a school social worker set up 4 or 5 sessions with a therapist in elementary school. However, plaintiff McHenry refused to speak or otherwise participate in these therapy sessions and has not sought or received any other therapy, counseling, or other treatment for behavior issues. Although behavior issues are less obviously a medical issue than, say, plaintiff Thompson's diagnosis of Attention-Deficit/Hyperactivity disorder, behavior issues are a common symptom of medical issues caused by the cognitive injuries claimed by the plaintiffs. Given the nature of the injuries claimed, and because it would not make sense to allow a plaintiff experiencing symptoms to avoid an obligation to mitigate by failing to obtain a diagnosis, McHenry's behavior issues should be considered medical in this context. I conclude that this evidence is sufficient for a jury to find that McHenry breached her duty to reasonably seek or submit to medical treatment.

Regarding plaintiff Dijonae Trammell, defendants have adduced evidence that she is "prone to fatigue and distractibility with prolonged engagement in cognitively taxing activities" but that she has neither sought nor received therapy, counseling, or other treatment for these issues and she and her mother have testified that she never applied for nor received any testing accommodation. Again, given the injuries claimed

by the plaintiffs, Trammel's fatigue and distractibility are medical issues, and I conclude this evidence is sufficient for a jury to find that Trammell breached her duty to reasonably seek medical treatment.

Plaintiffs argue that defendants' evidence improperly address the actions of the plaintiffs parents rather than the plaintiffs themselves. However, as I explained above, Wisconsin law assumes parents and caretakers will make medical decisions for minor children. Because the evidence addresses medical issues, it is appropriate. Accordingly, I will deny this motion.

Plaintiffs also reference an argument made by defendants in the *Burton* case: that the plaintiffs may have failed to mitigate damages by failing to avail themselves of educational opportunities. I foreclosed this argument in the *Burton* case because, among other reasons, the decision to hold minors to an adult standard of reasonable care has never been extended beyond the decisions to seek and undergo medical treatment, nor would to make sense to do so. *See Burton*, 341 F.Supp.3d at 950. Defendants do not raise this argument in their opposition brief, and it does not appear they intend to make it, but I will note that it is once again foreclosed for the same reasons discussed in the previous set of cases. *Id.*

### G. SHERWIN-WILLIAMS' MOTION FOR SUMMARY JUDGMENT BECAUSE PLAINTIFFS HAVE NOT DEMONSTRATED A PREREQUISITE NEED FOR THE RISK-CONTRIBUTION THEORY TO APPLY

Defendant Sherwin-Williams, joined by Armstrong, argues that the plaintiffs are not entitled to proceed on the basis of risk-contribution because risk-contribution becomes available *only* when a plaintiff produces admissible evidence showing that "insurmountable obstacles" foreclose his or her ability to identify the manufacturer of the

product that cause him or her harm. Sherwin-Williams argues that the plaintiffs have not met that threshold burden because they have not produced evidence that they tried but were unable to identify the manufacturer of the WLC that allegedly harmed them. Sherwin-Williams further argues that certain scientific tests can potentially identify the manufacturer of the WLC in paint chips taken from plaintiffs' residences, or at least narrow the pool of potential manufacturers, and that plaintiffs should have availed themselves of these tests before proceeding on a risk-contribution theory. I am not persuaded that the law of risk-contribution imposes such a threshold burden on WLC plaintiffs.

To begin, the Wisconsin Court of Appeals cases that Sherwin-Williams cites as indicative of the existence of such a requirement are inapposite: at issue in both was the extension of risk-contribution theory to new categories of consumer products claims, which is in contrast to the present case which applies risk-contribution theory to a product for which the theory's applicability has already been established by the state supreme court. *Rogers v. AAA Wire Products, Inc.*, 182 Wis.2nd 263 (Wis. App. 1994) (wire bread carts); *Drezdon v. AAA Ins. Co. et al.*, 121 Wis. 2d 697 (Wis. App. 1984) (metal tote boxes). Thus the courts' grant of summary judgment to the defendants in these cases cannot be taken as indicating that the "insurmountable obstacle" is a required showing case-by-case even after precedent has established that risk-contribution extends to the type of product at issue. In addition, the cases cited by Sherwin-Williams differ from *Thomas* and its predecessor *Collins* on a host of factual grounds: they involved a limited number of defendants, there was no possibility that more than one defendant had actually caused the plaintiffs' injuries, and the injuries

12

involved were isolated incidents unlikely to be replicated and not indicative of any broader public health or policy concern. *See* Laura Worley, *The Iceberg Emerged: Wisconsin's Extension of Risk-contribution Theory Beyond DES*, 90 Marq. L. Rev. 383, 392-95 (2006); *Collins v. Eli Lilly Co.*, 116 Wis.2d 166 (Wis. 2005); *Thomas*, 2005 WI 129.

Further, the court's recognition in *Collins* that the plaintiff faced "insurmountable obstacles" in identifying the manufacturer that harmed her does not amount to a requirement that, as Sherwin-Williams would have it, identification of the manufacturer be "impossible" for the plaintiff.[1] To impose such a requirement would be inconsistent with the risk-contribution method's burden shifting mechanism as outlined in *Collins*. In *Collins*, the court stated that a DES risk-contribution plaintiff need not allege any facts related to time or geographic location in which a given manufacturer defendant marketed DES, 116 Wis.2d at 193, but that once the plaintiff had made out a prima facie case, the defendant might exculpate itself by proving by a preponderance of the evidence that it did not produce or market DES in the time period or in the geographical market where the plaintiff's mother acquired DES. *Id.* at 197-198. The court explained,

> We conclude that it is appropriate to shift the burden of proof on time and geographic distribution to the defendant drug companies because they will have better access to relevant records than the plaintiff. Further, if relevant records do not exist, we believe that the equities of DES cases favor placing the consequences on the defendants.

*Id.* at 198. Given this allocation of burdens, it would be illogical and repetitious for a court to impose a requirement that DES plaintiffs show they had tried and were unable

---

[1] The defendants in *Thomas* did not contest plaintiff's inability to identify the manufacturer of the WLC that caused his harm, so the court did not address the issue.

to identify (or eliminate) the manufacturers that sold DES in the relevant time and geographical market as a prerequisite to proceeding on the risk-contribution theory. And the court's recognition of the possibility of exculpation (or "narrowing the pool") on the basis of time and geography did not negate the premise that the plaintiff faced "insurmountable obstacles" in identifying the manufacturers of the product that cause the harm.

For similar reasons, it would be illogical and repetitious to require WLC plaintiffs to perform the kind of testing Sherwin-Williams describes as a prerequisite to proceeding on risk-contribution theory. As *Collins* did for DES defendants, *Thomas* grants WLC defendants the opportunity to exculpate themselves on the basis of time and geography; *Thomas* further notes that, unlike DES defendants, WLC defendants also have "ample grounds to attack and eviscerate [plaintiff's] prima facie case, with some of those grounds including that lead poisoning could stem from any number of sources (since lead itself is ubiquitous) and that it is difficult to know whether [plaintiff's] injuries stem from lead poisoning since they are not signature injuries." *Thomas*, 2005 WI 129 at ¶163. The same equitable policy considerations that support the court's allocation of the burden of proof on time- and geography-based exculpation to defendants in *Collins* supports allocation of the burden on chemical-identity-based exculpation to defendants here. As in *Collins* the defendants are more likely to have access to the relevant records (such as formula cards or samples of WLC or paint products against which to compare the samples harvested from plaintiffs' homes). And, as in *Collins*, if relevant records do not exist, the equities favor placing the consequences on defendants.

As the Wisconsin Supreme Court established in *Thomas* and *Collins*, the basis for liability in risk-contribution cases is a showing that the defendant "reasonably could have contributed in some way to the actual injury." *Collins*, 116 Wis.2d at 191; *Thomas*, 2005 WI 129 at ¶164. To achieve this result, the court crafted a process in which plaintiffs establish a prima facie case on the basis of a defendant's contribution to the risk to the public by manufacturing or selling a defective product, and defendants may then exculpate themselves by establishing that their product could not in fact have caused the plaintiff's injury. *See Collins*, 116 Wis.2d at 317. Requiring plaintiffs to demonstrate that they have tried and failed to identify the manufacturer that harmed them will improve neither the integrity nor the outcome of this process, and the equities identified by the Wisconsin courts disfavor such a requirement. I will not foreclose plaintiffs use of risk-contribution theory on these grounds. Accordingly, this motion is denied.

## H. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THE LIABILITY OF NATIONAL LEAD

These cases will be tried in two phases. The first will determine whether the defendants are liable, and the second will determine how damages will be allocated. Under the risk-contribution theory, any defendants found liable in the first phase of the trial will be added to the "pool of liability" and damages will be allocated to each of them based on several factors outlined in *Thomas*. National Lead ("NL"), which is not a party to these cases, could be added to this "pool of liability" if a remaining defendant can show that NL is also liable to these plaintiffs under the risk-contribution paradigm.

Plaintiffs argue that the defendants cannot bring evidence sufficient to prove NL was strictly liable or negligent under risk-contribution and that, even if defendants could

15

show liability, defendants have insufficient evidence to create a triable question of fact regarding the allocation of damages to NL. Regarding a negligence theory, plaintiffs argue that none of defendants' experts offer evidence that NL knew of the dangers of WLC to children or failed to exercise ordinary care at the time it produced or marketed WLCs. Regarding strict liability, plaintiffs argue that none of defendant's experts could testify that NL's WLC was defective when it left NL's position and control because it lacked adequate warnings or that NL's WLC was unreasonably dangerous to the user or consumer because it lacked warnings. Finally, plaintiffs argue that defendants have not produced sufficient evidence that NL should be allocated damages because none of defendants' experts offer evidence relevant to the list of factors outlined in *Collins* and *Thomas.*

Defendants, however, have identified sufficient evidence in the record to allow a reasonably jury to find NL liable to these plaintiffs and to allocate some portion of the damages to NL. Defendants point to statements from trade associations in which NL was involved discussing the dangers of lead to children.[2] They also point to medical literature detailing the dangers of WLC and dating to the early 1900s. I conclude this is sufficient evidence for a reasonable jury to find that NL knew of the dangers of WLC to children during the relevant time period.

---

[2] Much of the evidence defendants rely on to show NL's liability is the same evidence plaintiffs intend to use to show the defendants' liability. Over the course of this case, defendants have argued that this evidence should be excluded and they maintain that position. Here they argue only that, if the evidence is admitted and the jury finds it sufficient to prove their own liability, then it should also allow a reasonable jury to find NL liable.

Defendants also identify ample evidence that NL produced and marketed WLC for household use during the relevant time period, including testimony from the expert historians Drs. Stevens, Dunlavy, and Adamson. I conclude that if a reasonable jury found that NL was aware of the dangers WLC posed to children, this evidence is sufficient for the same reasonable jury to find that NL breached its duty of reasonable care by continuing to produce and market WLC for household use.

As regards strict liability, defendants point to the deposition of expert historian Dr. Stevens, who testified that neither NL's newspaper advertisements nor NL's packaging for its white lead in oil contained warnings about the dangers of WLC to children. I conclude that this is sufficient evidence for a reasonable to jury to conclude that NL failed to warn of dangers of WLC. Given the medical literature on the record, the same jury could find that NL's WLC products were consequently unreasonably dangerous.

Finally, plaintiffs argue that, even if NL is included in the pool, defendants cannot produce enough evidence to create a triable question of fact regarding the allocation of damages to NL. Under a risk-contribution theory, damages are allocated according to comparative negligence, which the Wisconsin Supreme Court described as "a flexible doctrine" which will allow a jury "equitably to apportion liability among the defendants that have been unable to exculpate themselves." *Collins*, 116 Wis. 2d. at 200. The *Collins* court determined that a jury may consider the following nonexhaustive list of factors in DES cases:

> [W]hether the drug company conducted tests on DES for safety and efficacy in use for pregnancies; to what degree the company took a role in gaining FDA approval of DES for use in pregnancies; whether the company had a small or large market share in the relevant area; whether the company took the lead or merely followed the lead of others in producing or marketing DES; whether the company issued warnings about the dangers of DES; whether the company

produced or marketed DES after it knew or should have known of the possible hazards DES presented to the public; and whether the company took any affirmative steps to reduce the risk of injury to the public.

*Id.* I may, in my, discretion permit the jury to consider other factors. *Id*. Most, though not all, of these factors are applicable to WLC cases under the risk-contribution theory. Plaintiffs argue that the only factor on which defendants have offered evidence is market share, and that defendants' offered evidence fails because it addresses NL's national market share rather than NL's market share in the relevant area.

I disagree. Defendants' experts do opine on NL's market share in the Milwaukee area, although they do not offer specific, quantitative data. Nothing in either *Collins* or *Thomas* suggests that the evidence needs to be quantitative; *Collins* merely states that the jury may consider whether the company "has a small or large market share in the relevant area." *Id.* Although exact data may carry more weight, the opinions of defendants' experts are relevant to this consideration and a reasonably jury may, based on those opinions, allocate some damages to NL provided NL is found to be in the pool. The opinions of defendants' experts may also be relevant to other factors, but I need not decide that now because evidence on any of the factors is sufficient to defeat summary judgment. Accordingly, this motion is denied

## I. SHERWIN-WILLIAMS' MOTION FOR SUMMARY JUDGMENT ON CLAIMS PREDICATED UPON ACTIVITIES PROTECTED BY THE FIRST AMENDMENT

Sherwin-Williams, joined by Armstrong, moves for partial summary judgment on "every claim that is based upon protected First Amendment activity." Sherwin-Williams argues that plaintiffs seek to hold it liable for three types of lawful and constitutionally-protected conduct: (1) truthful commercial speech, in the form of advertisements

18

created by both Sherwin-Williams and trade associations; (2) Sherwin-Williams' participation in trade associations, including the Lead Industries Association ("LIA"); and (3) trade associations' lobbying of legislatures.

Plaintiffs, however, do not seek to hold Sherwin-Williams or Armstrong liable for these activities. Rather, plaintiffs seek to hold the defendants liable for negligence or the production or sale of an unreasonably dangerous product. The First Amendment does not prohibit the use of protected speech as evidence to show elements of an otherwise valid claim. There is a clear distinction between the alleged conduct on which the plaintiffs' liability may rest (the production and sale of WLC) and the evidence used to establish the elements of the claims (the constitutionally protected conduct identified by the defendants).

Sherwin-Williams points to the fact that, in the *Burton* trial, the verdict form permitted the jury to find defendants negligent for "marketing" WLCs. However, the jury in that case was instructed that "the word 'marketing' is intended to mean offering the product for sale." 07-cv-0303 ECF no. 1614 129 at 24-25. This definition does not encompass truthful advertisements, as Sherwin-Williams seems to suggest. Sherwin-Williams also argues that plaintiffs' expert witnesses intend to "rely on" or "emphasize" the constitutionally protected conduct. As I explained, the conduct may be used as evidence. The fact that plaintiffs' experts may emphasize certain evidence does not change the underlying claims upon which plaintiffs seek to hold defendants liable. Accordingly, this motion is denied.

19

### J. SHERWIN-WILLIAMS MOTION FOR SUMMARY JUDGEMENT ON NEGLIGENCE AND STRICT LIABILITY CLAIMS

Sherwin-Williams, joined by Armstrong and DuPont, argues it is entitled to summary judgment on plaintiffs' negligence and strict liability claims for the following reasons: (1) plaintiffs have not adduced evidence showing the product was defective when it left the defendants' control; (2) plaintiffs cannot show that there was a duty to the plaintiffs; (3) plaintiffs cannot show defendants breached a duty of care; (4) the WLC underwent a substantial change before reaching the consumer; (5) the plaintiffs cannot show causation; (6) the plaintiffs cannot show warnings after 1954 were inadequate; and (7) some of plaintiffs' claims are preempted by Federal law.

### 1. PRODUCT DEFECT

Sherwin-Williams argues that it is entitled to summary judgment on the plaintiffs' strict liability claims because the plaintiffs did not adduce legally sufficient evidence that Sherwin-Williams' WLC was defective. Sherwin-Williams argues that to establish that its WLC was defective the plaintiffs were obligated to present evidence of what warnings Sherwin-Williams should have given in order to render the WLC non-defective.[3]

---

[3] Though it does not explicitly say so, Sherwin-Williams appears to be applying the Restatement (Third) of Torts' treatment of the strict product liability claim, which the Wisconsin Legislature codified in 2011 in Wis. Stat. § 895.047. This statute provides that, for purposes of a strict product liability claim, "[a] product is defective because of inadequate instructions or warnings only if the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe." Wis. Stat. § 895.047(1)(a). This standard focuses on the manufacturer's conduct and requires plaintiff to prove that the manufacturer did or should have foreseen the risk of harm associated with its product.

It is likely true that, if Wis. Stat. § 895.047 defined the substantive requirements of the present plaintiffs' strict liability claims, the plaintiffs would need to present evidence as to what "reasonable warnings or instructions" Sherwin-Williams might have provided

20

At the time that the plaintiffs filed their lawsuits, the common law governing strict products liability in Wisconsin required plaintiffs to prove the following elements in order to establish a strict liability claim:

(1) That the product was in defective condition when it left the possession or control of the seller or manufacturer;

(2) That it was unreasonably dangerous to the user or consumer;

(3) That the defect was a cause of the plaintiff's injuries or damages;

(4) That the seller or manufacturer engaged in the business of selling or manufacturing such product; and

(5) That the product was one which the seller or manufacturer expected to and did reach the user or consumer without substantial change in the condition it was in when the seller or manufacturer sold it.

*See Dippel v. Sciano,* 37 Wis. 3d 443, 460 (1967); *Haase v. Badger Mining Corp.*, 274 Wis.2d 143, 154-55 (2004); *Thomas*, 2005 WI 129; Restatement (Second) of Torts § 402A.

Under the common law governing these cases, the Restatement (Second) of Torts' "consumer contemplation" test determines both whether a product was defective and whether it was unreasonably dangerous. *Green v. Smith & Nephew AHP, Inc.*, 245 Wis. 2d 772, 823 (2001). Per this test, a product is defective if, at the time it leaves the

_____

that would have "reduced or avoided" the foreseeable harms caused by WLC. But § 895.047 does not govern these plaintiffs' claims. "The treatment of section [] … 895.047 … first appl[ies] to actions or special proceedings that are commenced on the effective date of this subsection." 2011 Wis. Act 2, § 45(5). These plaintiffs initiated their lawsuits in January, 2011, and § 895.047 did not take effect until February 1, 2011. *See Nelson v. Johnson & Johnson,* 2019 WL 3082500 at *3 (E.D. Wis. July 14, 2019).

seller's hands, it is "in a condition not contemplated by the ultimate consumer." *Id.* at 797. A defective product is unreasonably dangerous where it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id.* However, a manufacturer might, in some circumstances, prevent a product from being rendered unreasonably dangerous by issuing appropriate warnings or directions for use. *Id.* at 829.

In short, under the applicable law, plaintiffs are not required to prove that reasonable warnings would have reduced the foreseeable harms associated with Sherwin-Williams' WLC was defective. They need only to show that the WLC was in a condition not contemplated by the ultimate consumer. Plaintiffs have adduced evidence that WLC is toxic, and that when it is incorporated into residential paint it has the propensity to be released as the paint deteriorates and mixes with household dust, where it is easily ingested by children. Plaintiffs also have expert historians who will opine that between 1900 and 1950, residential paint consumers did not contemplate that WLC in paint might mix with household dust and poison children. That is sufficient evidence for a reasonable jury to find that WLC was defective under the consumer contemplation test, spanning the 1910-1950 period. The same evidence, together with evidence plaintiffs have adduced concerning the potential severity of lead poisoning, is sufficient to support a reasonable jury's finding that WLC was unreasonably dangerous for that period.

If plaintiffs can make that showing, the burden will be on the defendants to show that their warnings were sufficient to render the WLC not unreasonably dangerous. *See*

*Green*, 245 Wis.2d at 829; *see also Schuh v. Fox River Tractor Co.*, 63 Wis. 2d 728, 737 (1974)("In the absence of a warning to the contrary, the jury could well conclude that the machine was unreasonably dangerous and defective in design."). There is sufficient evidence on the record for a jury to find the product was defective and plaintiffs have no obligation to present evidence of what warnings defendants ought to have given to render the product not unreasonably dangerous. This portion of the motion is denied.

## 2. DUTY TO WARN AND DUTY OF ORDINARY CARE

Sherwin-Williams argues that because it did not have a duty to warn the plaintiffs, the plaintiffs cannot show that the defendants' conduct violated a legally recognized duty to the plaintiffs. As Sherwin-Williams notes, I addressed this issue during the first set of cases. *Burton v. Am. Cyanamid*, 334 F. Supp 3d 949, 961 (E.D. Wis. 2018). In short, I concluded that by the time the plaintiffs suffered their alleged injuries, the dangers of WLC and lead in general were well known and WLC manufacturers and sellers had ample reason to believe that persons residing in homes with older paint would be aware of the toxicity of the lead compounds possibly in their paint, and of the various mechanisms by which that lead might be ingested. *Id.* The same reasoning applies to this case, and plaintiffs are foreclosed from pursuing negligence claims that rely on a duty to warn theory. However, as I also found in the previous set of cases, plaintiffs may continue to pursue negligence claims based on the general duty of ordinary care.

Sherwin-Williams argues that plaintiffs cannot pursue negligence claims based on the general duty of ordinary care for two reasons: (1) any negligence claim in the

products context requires proof of some defect, and plaintiffs have not offered legally sufficient evidence of a defect; and (2) any negligence claims requires a duty *to the plaintiffs* and Wisconsin law does not recognize a general duty "to the world." Regarding the first reason, Sherwin-Williams cites *Godoy ex rel. Gramling v. E.I. du Pont de Nemours* for the proposition that there are three categories of product defects under Wisconsin law: manufacturing defects, design defects, and defects based on a failure to adequately warn. 768 N.W.2d 674, 683-84 (Wis. 2009). Plaintiffs do not allege a manufacturing or design defect and the product cannot be defective due to a failure to warn, it argues, because I have held that Sherwin-Williams has no duty to warn Plaintiffs.

In *Burton* I held, as I do here, that defendants did not have a duty to warn owed *to the specific plaintiffs*, in large part due to information which became more well-known after the houses were likely painted but before these plaintiffs allegedly suffered their injuries. This does not mean that producers or manufacturers of WLC never had a duty to warn anyone. As explained in the previous section, the plaintiffs have identified evidence sufficient for a reasonable jury to find, under the consumer contemplation test, that the WLC was defective due to a failure to warn. The focus of the test is on the condition of the product at the time it leaves the sellers' hands, so the intervening dissemination of information about lead between the time the time the homes could have been painted and when the plaintiffs ingested lead is not relevant. Put another way, although defendants had no duty to warn children or caregivers in during the 1990s and later, and so had no duty to these plaintiffs, that does not preclude the possibility of a duty to warn at the time the WLC was actually sold.

Regarding Sherwin-Williams' second reason, under Wisconsin law, "everyone owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others." *Brennan v. Amerisure Mutual Insurance Company*, 374 Wis.2d 578, 588 (2017) (quoting *Behrendt v. Gulf Underwriter Ins. Co.*, 318 Wis. 2d 622, 635 (2009)). Sherwin-Williams is correct that this does not mean "every negligence claim arrives at court with the [duty] element already proven," and "[w]hat is within the duty of ordinary care depends on the circumstances under which the claimed duty arises." *Id.* at 588-589 (quoting *Hoida, Inc. v. M & I Midstate Bank*, 291 Wis.3d 283, 307 (2006)). In other words, "a duty of care[] is established under Wisconsin law whenever it was foreseeable to the defendant that his or her act or omission to act might cause harm to some other person." *Hornback v. Archdiocese of Milwaukee*, 313 Wis.2d 294, 309 (2008) (quoting *Gritzner v. Michael R.,* 234 Wis.2d 781, ¶ 20 (2000)).

Manufacturers are subject to the duty of ordinary care. The Wisconsin pattern jury instructions illustrate this point:

> The duty of a manufacturer or supplier of a product is to exercise ordinary care to insure that the product will not create an unreasonable risk of injury or damage to the user or owner when used in its intended or foreseeable manner. This duty must be "approached from the standpoint of the standard of care to be exercised by the reasonably prudent person in the shoes of the defendant manufacturer or supplier." A manufacturer, **among other requirements**, is required to exercise ordinary care in the manufacture of its product in the following respects: (1) safe design of the product so that it will be fit for its intended or foreseeable purpose; (2) construction of the product so that the materials and workmanship furnished

will render the product safe for its intended or foreseeable use; (3) adequate

inspections and tests to determine the extent of defects both as to materials and

workmanship; (4) adequate warnings of danger in the use of the product and

adequate instructions as to the proper use of the product which is dangerous

when used as intended.

WIS JI-CIVIL 3200—Products Liability: Law Note For Trial Judges (emphasis added;

citation omitted. As the emphasized language makes clear, the four enumerated duties

in the jury instruction do not represent the entire range of obligations imposed on a

manufacturer under the general rubric of ordinary care. If the unreasonable risk of injury

associated with a product cannot be adequately addressed through improved design,

construction, inspections, or warnings, the manufacturer remains under an obligation to

take other, reasonable action to ensure that the product does not cause unreasonable

harm. "The duty of ordinary care under the circumstances is determined by what would

be reasonable given the facts and circumstances of the particular claim at hand." *Hoida*,

291 Wis.2d at 308.

 In the present case, the defendants owed a duty to exercise ordinary care, that is

a duty to refrain from those acts which may unreasonably endanger the safety of others,

in manufacturing and marketing WLC. The plaintiffs claim that it was foreseeable to the

defendants that WLC incorporated into paint and applied to the walls of homes might be

ingested by children and cause injury. Plaintiffs have adduced sufficient evidence for a

reasonable jury to find in the plaintiffs' favor on this point, including: Australian medical

literature published between 1904 and 1909 documenting cases of childhood lead

poisoning, a 1917 article published in an American medical journal discussing the

Australian findings and describing childhood lead poisoning cases in the United States, and an address delivered by a Washington researcher in 1914 warning that gradual disintegration of paint could result in the formation of dangerous white lead dust. If there was a foreseeable risk of harm from the intended use of the product, the defendants had a duty to mitigate that risk.

Sherwin-Williams also relies on *Brenner*, a premises liability case, which held that tenants of a property did not have a duty to inform "all future strangers who may come into possession of the property" about potentially dangerous conditions. *Brenner*, 893 N.W.2d at 198-99. *Brenner* is easily distinguishable. It concerns the limits of the duty of ordinary care as applied to possessors of real property in a premises liability action. The limits of the ordinary duty of care in products liability are established by the foreseeable and ordinary uses of a product.

Sherwin-Williams also moves for summary judgement on plaintiffs' strict liability claim on the basis that plaintiffs cannot show a duty to warn because: (1) I previously ruled that plaintiffs could not show a duty to warn to the plaintiffs in their negligence claim; and (2) defendants had no duty to warn at the time of sale.

Regarding the first reason, it is true that I ruled in the first set of cases that plaintiffs could not show a duty to warn to the plaintiffs themselves under a negligence theory. However, I was clear that the same analysis did not apply to the strict liability claims. *Burton*, 334 F.Supp.3d at 958. Rather, I held the strict liability failure to warn claim under *Thomas* does **not** require proof that the defendant owed and breached a duty **to the plaintiff.** *See Id.* My ruling that the plaintiffs in that case could not show a duty to warn to the plaintiffs is therefore irrelevant to the strict liability claims.

As to the second reason, Sherwin-Williams argues that plaintiffs cannot show a duty to warn at the time of the sale under the consumer contemplation test because their primary customers were master painters and plaintiffs have adduced no evidence that master painters were unaware of the risk. Under the consumer contemplation test, in order for a duty to warn to arise, "[t]he article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts § 402A, cmt. i. As I previously held, the "ordinary consumer" in question here must be understood as the ordinary consumer who purchased or used WLC or paint containing WLC during the years it was being produced and sold by the defendants. *Burton*, 334 F.Supp.3d at 962. Although master painters were among the consumers of these products, plaintiffs have identified evidence that Sherwin-Williams marketed their products directly to the public, including statements from Sherwin-Wililams itself, as well as evidence that general consumers were purchasing paint and painting their own homes at least as early as 1925, including a market analysis from 1926. This is sufficient evidence for a jury to conclude that general consumers, in addition to master painters, were among the ordinary consumers of WLC and WLC products.

Plaintiffs have adduced sufficient evidence for a jury to find that WLC and WLC products were dangerous beyond what would be contemplated by an ordinary consumer. In particular, evidence that lead industry executives, during the relevant time period, affirmatively sought to suppress and rebut efforts to inform the public about childhood lead poisoning caused by consumer products supports an inference that the

28

public was not as informed as the manufacturers and sellers of WLC about the dangers of the products and the mechanisms of exposure. Plaintiffs have also adduced evidence that, during the relevant time period, the lead industry actively worked to promote a public perception that lead-based paint was safe and hygienic, further bolstering the inference. This evidence is sufficient for a reasonable jury to find that WLC and products containing WLC were dangerous to an extent beyond that which would be contemplated by an ordinary consumer. Accordingly, I will deny this portion of Sherwin-Williams motion.

### 3. BREACH OF DUTY

Sherwin-Williams also argues that the risks presented by WLC were too remote as a matter of law to be foreseeable. In support they cite several cases in which courts found that the lack of foreseeability limited liability to the party directly responsible for the harm. In *Martin v. Harrington & Richardson, Inc.*, for instance, the 7th Circuit dismissed a negligence claim against a gun manufacturer because "criminal misuse of a handgun is not a foreseeable consequence of gun manufacturing." 743 F.2d 1200, 1205 (7th Cir. 1984). This case is analogous, Sherwin-Williams argues, because lead paints are only dangerous if misused, for example if landlords allow them to deteriorate. This necessary inaction by landlords makes the risk of WLC too remote to be foreseeable as a matter of law, the argument goes, especially because Wisconsin and the federal government require property owners to prevent or abate hazards from deteriorated lead paints.

Sherwin-Williams' argument is not persuasive. To begin, the regulations and statutes cited by it requiring property owners to prevent or abate hazards from

deteriorated lead paint have gone into effect after the defendants stopped producing or selling WLC products. Sherwin-Williams points to no law that would have established a duty for property owners or landlords to abate or prevent hazards from deteriorated lead that were in effect at the time it or other defendants were producing or selling WLC for residential use. The present-day legal duties of landlords simply have no bearing on what harms were foreseeable at the time the products were produced and sold. Further, I have already held, as a matter of law, that a resident or landlord passively allowing paint to deteriorate is an eminently foreseeable misuse of the product. *Burton v. American Cyanamid*, 341 F.Supp.3d 941, 947-948 (E.D. Wis. 2018). Because such a misuse is foreseeable, a reasonable jury could find that Sherwin-Williams breached its duty of ordinary care.

Sherwin-Williams also argues that plaintiffs' cannot show foreseeability as a matter of law as regards their strict liability claims for the same reasons. This argument fails for the same reason. Accordingly, I will deny this portion of Sherwin-Williams motion.

## 4. SUBSTANTIAL CHANGE

Next, Sherwin-Williams argues that plaintiffs cannot present sufficient evidence that the WLC and WLC products reached consumers or users without substantial change, which is an element of their strict liability claims. Sherwin-Williams argues that the product was altered as the paint deteriorated into the dust the plaintiffs allege they ingested.

Under applicable Wisconsin law, "[m]anufacturers or sellers cannot be held strictly liable if the condition of the product substantially changes in a way that is

material to the accident after the product leaves their control… [A] substantial and material change [is] a change in the design, function or character of the product linked to the accident." *Haase v. Badger Mining Corp.*, 274 Wis.2d 143, 155-56 (Wis. 2004) (quoting *Glassey v. Continental Insurance Company*, 176 Wis.2d 587, 600 (Wis. 1993)). The purpose of the substantial change requirement "is to protect a manufacturer from liability when the dangerously defective aspect of the product was altered or introduced after the product left the manufacturer's control." *Godoy*, 319 Wis.2d at 119. "Often, the issue of whether there was a substantial and material change is a fact-intensive inquiry." *Id.*

Here, plaintiffs have adduced evidence that WLC was dangerously defective because of its toxicity and its powder form, which allowed it to mix with household dust after the paint deteriorated. Sherwin-Williams argues that it was the deterioration of the paint itself that created this particular risk. Given that WLC is inherently toxic and that paint inevitably deteriorates, a reasonable jury could find that these changes were not material. Accordingly, I will deny this portion of Sherwin-Williams motion.

### 5. CAUSATION

Sherwin-Williams also argues that, to the extent that the WLC was defective on a failure to warn theory at the time the pigment left their control, they are nevertheless entitled to summary judgment because plaintiffs have not offered evidence that the defect was a cause of their injuries. It argues that, under Wisconsin law, causation requires "showing that, if properly warned, [plaintiffs] would have altered behavior and avoided injury. *Lemmerman v. Blue Cross Blue Sheild*, 713 F.Supp.2d 791, 811 (E.D. Wis. 2010). Sherwin-Williams asserts that it is plaintiffs' burden to show that, had

warning labels warned of the alleged risks to children of ingesting WLC during the time that each company manufactured and sold WLC products, such a warning would have changed someone's conduct and prevented each plaintiff's lead exposure and alleged harm. Sherwin-Williams also argues that plaintiffs cannot meet their burden of proof with respect to causation on the warnings claim because they have not provided expert testimony.

I previously addressed the first argument during the first set of cases. *See Burton*, 334 F.Supp.3d at 965-967. I will not revisit reasoning from that order in its entirety, but Sherwin-Williams' desired standard is incompatible with the purpose of the risk-contribution theory to enable a plaintiff to recover without identifying the specific manufacturer of the product that caused him or her harm. *Id.* As I previously held, to satisfy the causation element of a failure-to-warn theory of defect under the risk-contribution theory described by *Thomas*, a plaintiff must prove to the satisfaction of the trier of fact that the presence of inadequately-warned-about WLC on the market during the existence of the residence where the plaintiffs ingested WLC was a substantial factor in causing the plaintiff's injury. Human behavior is implicated in this question, in addition to the medical and mechanical issues already built into the risk-contribution model. *Id.*

To prove such a connection to the satisfaction of a jury will be a tall order, but I will allow plaintiffs to proceed on their failure to warn claims. Although plaintiffs still bear the burden of showing causation, a jury might find in their favor by making the permissible inference, e.g., that the persons responsible for selecting and applying paint to the plaintiffs' homes throughout the buildings' existence would have heeded warnings

regarding the risk of childhood lead exposure if such warnings had been issued. *See Michael's v. Mr. Heater, Inc.*, 411 F.Supp.2d 992, 1007 (W.D. Wis. 2006); *Tanner v. Shoupe*, 228 Wis.2d. 357, 379 (1999). Sherwin-Williams' citations to *Lemmermann* to disallow such an inference are unpersuasive, as the plaintiff in that case had failed to adduce evidence that her exposure to the product in question was a cause of her injuries in a medical sense. 713 F.Supp.2d at 812. Sherwin-Williams' argument that plaintiffs must produce an expert witness to testify as to causation on a failure to warn claim is also unpersuasive, as the necessary inference here does not require specialized technical, scientific, or medical knowledge, but may be made on the basis of common understandings of human behavior. Accordingly, I will deny this portion of Sherwin-Williams' motion.

### 6. EVIDENCE OF INADEQUATE WARNINGS AFTER 1954

Sherwin-Williams argues that it is entitled to partial summary judgment on the negligence and strict liability claims for products manufactured or marketed after 1955 because the products contained warning labels regarding hazards to children and plaintiffs therefore cannot prove failure to warn.[4] Specifically, the labels offer the following warning regarding hazards to children: "CONTAINS LEAD OR OTHER COMPOUNDS, HARMFUL IF EATEN. Do not apply on toys, furniture or interior surfaces which might be chewed by children."[5] 11-cv-0055 ECF no. 807-2 p. 209. Although this warning does alert the consumer to the fact that lead is harmful to children, it does not warn of the dangers of deteriorating paint and the resulting mixture

---

[4] DuPont, which joins Sherwin-Williams' motion, began adding such warning labels to its products in 1955.
[5] DuPont's warning labels, beginning in 1955, contained the same statement.

33

of lead and dust which is often ingested by infants. Sherwin-Williams, however, argues that plaintiffs have no evidence of the efficacy of the labels because they offer no expert opinion on the subject.

I disagree. A reasonable jury could infer from the warnings themselves that they were not adequate given they did not warn of the dangers of deteriorating paint and did not warn against the use of the product on interior walls. Such a danger, therefore, could have been outside the expectation of the ordinary consumer. A reasonable jury could further infer that a more complete warning would have prevented the use of the paint in the plaintiffs' homes. Expert testimony is not needed because specialized technical, scientific, or medical knowledge is not necessary to make these inferences; they may be made on the basis of common understandings of human behavior. Accordingly, I will deny this portion of the motion.

### 7. FEDERAL PREEMPTION

Sherwin-Williams argues that it is entitled to partial summary judgment on any failure-to-warn claim based on Sherwin-Williams' product labels after a 1966 amendment to the Federal Hazardous Labeling Substances Act ("FHSA") which explicitly preempted state law warning requirements for lead paints. Plaintiffs have not identified any evidence that defendants' warning labels violated the FHSA. Accordingly, I will grant this portion of Sherwin-Williams motion.

### K. DUPONT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

DuPont moves for partial summary judgment on plaintiff D'Angelo Thompson's negligence and failure-to-warn claims. DuPont argues that, because it did not produce its own WLC after 1924 and because plaintiff Thompson's house was built in 1926, the

exculpation defense described in *Thomas* should apply and DuPont should be excluded from the "pool of liability." *See Thomas*, 2005 WI 129 ¶ 163. Plaintiffs, meanwhile, argue that although DuPont may not have produced WLC after 1924, it nonetheless marketed WLC, produced by others, that had been integrated into other products. DuPont argues that marketing WLC which has been integrated into other products is not a basis for liability under *Thomas* because the case did not address whether the risk-contribution theory could apply to paint manufacturers, because *Thomas* did not intent to expand its holding by borrowing the phrase "produced or marketed" from *Collins*, and because *Godoy* affirms that risk-contribution theory does not apply to paint manufactures.

DuPont is arguing, in other words, that the integration of purchased WLC into other products and the sale of those products does not qualify as "producing or marketing" WLC under *Thomas* and *Godoy*. I ruled on this issue in the prior round of cases and came to the opposite conclusion. *See* 07-C-0303 ECF no. 1324; *Burton v. American Cyanamid*, 2020 WL 1821139, *7 (E.D. Wis). That ruling stands, and I will not revisit the entirety of my reasoning here. The *Thomas* decision explicitly indicates that a defendant's marketing, as well as production, of WLC can be a basis for liability. *Thomas*, 2005 WI 129 at ¶¶ 161-62. Integrating WLC into a product and then selling the product falls under the umbrella of marketing. DuPont has not shown evidence that it did not market WLC by integrating WLC into products and selling those products in the Milwaukee area while plaintiff Thompson's house was in existence. Therefore, I will deny DuPont's motion for partial summary judgment.

### L. SHERWIN-WILLIAMS MOTION FOR SUMMARY JUDGEMENT PURSUANT TO WIS. STAT. § 895.046

Sherwin-Williams moves for summary judgment on all claims pursuant to Wis. Stat. § 895.046. The motion is joined by Armstrong. Sherwin-Williams' motion is nearly identical to its motion on the same issue which I denied in the first set of cases. *Burton v. American Cyanamid*, 2018 WL 2561034 (E.D. Wis.). This motion is denied for the reasons discussed in that order. *Id.*

## III. CONCLUSION

**THEREFORE IT IS ORDERED** that the motions in no. 11-CV-0055 at ECF nos. 747, 758, 772, 774, 782, 786, 803, 793, and 810 are **DENIED.**

**IT IS FURTHER ORDERED** that the motions in no. 14-CV-1423 at ECF nos. 516, 535, 542, 548, 550, 560, 568, and 572 are **DENIED.**

**IT IS FURTHER ORDERED** that the motions in no. 11-CV-0055 at ECF nos. 744, 750, and 809 are **GRANTED.**

**IT IS FURTHER ORDERED** that the motions in no. 14-CV-1423 at ECF nos. 519, and 575 are **GRANTED**

**IT IS FURTHER ORDERED** that the motions in no. 11-CV-0055 at ECF no. 800 is **GRANTED IN PART** and **DENIED IN PART** as explained above.

36

**IT IS FURTHER ORDERED** that the motions in no. 14-CV-1423 at ECF no. 559

is **GRANTED IN PART** and **DENIED IN PART** as explained above.


Dated in Milwaukee, Wisconsin, this 22nd day of March, 2021.

s/Lynn Adelman
LYNN ADELMAN
United States District Judge