# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**GLENN BURTON, JR.,**
   **Plaintiff,**

  **v.**          **Case No. 07-C-0303**

**AMERICAN CYANAMID CO., et al.,**
   **Defendant.**

---

**RAVON OWENS,**
   **Plaintiff,**

  **v.**          **Case No. 07-C-0441**

**AMERICAN CYANAMID CO., et al.,**
   **Defendant.**

---

**CESAR SIFUENTES,**
   **Plaintiff,**

  **v.**          **Case No. 10-C-0075**

**AMERICAN CYANAMID CO., et al.,**
   **Defendant.**

---

**ERNEST GIBSON,**
   **Plaintiff,**

  **v.**          **Case No. 07-C-0864**

**AMERICAN CYANAMID CO., et al.,**
   **Defendant.**

---

**MANIYA ALLEN, et al.,**
   **Plaintiff,**

  **v.**          **Case No. 11-C-0055**

**AMERICAN CYANAMID CO., et al.,**
   **Defendant.**

---

**DEZIREE VALOE, et al.,**
        **Plaintiffs,**

        **v.**                                    **Case No. 11-C-0425**

**AMERICAN CYANAMID CO., et al.,**
        **Defendant.**

─────────────────────────────────────────────────────

**DIJONAE TRAMMELL, et al.,**
        **Plaintiff,**

        **v.**                                    **Case No. 14-C-1423**

**AMERICAN CYANAMID CO., et al.,**
        **Defendant.**

─────────────────────────────────────────────────────

## <u>DECISION AND ORDER</u>

The plaintiffs in these actions allege that they suffered injuries from exposure to white lead carbonate ("WLC"), a dry white powder historically used as the pigment in many lead-based paints. The plaintiffs allege that they were exposed to the paint in the 1990s and early 2000s, while they were children living in homes in Milwaukee, Wisconsin, that had lead-based paint on their surfaces. Because the plaintiffs cannot identify the specific company that manufactured the products that injured them, they could not bring suit until the Wisconsin Supreme Court decided *Thomas ex rel. Gramling v. Mallett*, 285 Wis.2d 236 (2005), in which it adopted a "risk contribution" theory of liability for plaintiffs suing manufacturers of white lead carbonate. The risk-contribution theory modifies the ordinary rule in tort law that a plaintiff must prove that a specific defendant's conduct caused his injury. It instead seeks to apportion liability among the pool of defendants who could have caused the injury. Using this theory, the plaintiffs seek to hold several manufactures of white lead carbonate (or their successors) liable under theories of

2

negligence and strict liability for the injuries they suffered from ingesting lead paint particles.

The suits now before me were filed between 2007 and 2011 and involve approximately 170 plaintiffs. I have been presiding over most of these cases since their inception and have been presiding over all of them since 2016, when the lone outlier (*Gibson v. American Cyanamid Co.*, Case No. 07-C-0864) was reassigned to me. Since 2016, much has happened. I have decided various matters through dispositive motion practice, the claims of three plaintiffs have gone to trial, one major defendant reached a settlement with all plaintiffs, and the Seventh Circuit has issued a decision that addresses many of the significant issues in this case.

Before me now are the remaining defendants' motions for summary judgment on the claims of all plaintiffs. Although these motions raise several issues, their predominant theme is that all plaintiffs are now bound by prior adverse rulings made by the Seventh Circuit and by me. The defendants contend that, under these prior rulings, no plaintiff may proceed to trial on his or her claims against any defendant. The plaintiffs do not dispute that, if the prior rulings bind all plaintiffs, then the defendants are entitled to summary judgment. However, the plaintiffs urge me not to apply those rulings to plaintiffs whose claims have yet to be tried. The plaintiffs ask me to reconsider a key ruling that I made when deciding an earlier motion for summary judgment that relates to whether the defendants had a duty to warn about the dangers of white lead carbonate. In the alternative, the plaintiffs argue that I may not apply this ruling to those of them whose individual claims have not been explicitly addressed through dispositive motion practice or at trial.

3

As discussed below, I conclude that my duty-to-warn ruling will stand and that it binds all plaintiffs under the doctrines of law of the case and issue preclusion. For this reason, the defendants are entitled to summary judgment on all claims.

## I. BACKGROUND

### A.    Prior Proceedings

The present litigation commenced when Glenn Burton, Jr., filed a complaint in Milwaukee County Circuit Court against eight manufactures of white lead carbonate. In early 2007, the defendants removed that case to this court under the diversity jurisdiction, and it was assigned to me and given Case Number 07-C-0303. Around the same time, two other cases were filed in state court and removed here and assigned to other judges of this court. The plaintiffs in those cases are Ravon Owens (No. 07-C-0441) and Ernest Gibson (No. 07-C-0864). The Owens case was quickly reassigned to me after the parties refused to consent to the exercise of jurisdiction by a magistrate judge. The Gibson case would remain pending before another judge of this court until 2016, when it was reassigned to me.[1]

In 2010 and 2011, plaintiffs represented by the same counsel as Burton, Owens, and Gibson began filing complaints directly in this court. In early 2010, Cesar Sifuentes (No. 10-C-0075) filed a complaint in this court, and his case was assigned to me. In 2011, over 160 individuals joined together as plaintiffs and filed a single complaint against the manufacturers of white lead carbonate. In that action, *Maniya Allen, et al. v. American*

---

[1] An eighth case, *Stokes v. American Cyanamid Co., et al.*, No 07-C-0865, was filed in state court and removed here in 2007. However, that case was dismissed in 2016, and therefore I will not discuss it further.

4

*Cyanamid Co., et al.*, No. 11-C-1155, the plaintiffs indicated on their civil cover sheet that the case was related to the prior cases already pending before me. Under this court's local rule regarding related cases, *see* Civ. L.R. 3, the case was directly assigned to me. Also in 2011, Deziree and Detareion Valoe (No. 11-C-0425) filed a complaint against the manufacturers of white lead carbonate and indicated that it was related to the other lead-paint cases; it, too, was assigned to me. The final case was filed by Dijonae, Ty'Jai, and Jaquan Trammell. These three plaintiffs were originally part of the *Allen* action, but the parties agreed to sever their claims into a separate suit to cure a jurisdictional issue that arose because the Trammells were citizens of the same state as one of the defendants. When the severance occurred in 2014, the new case was assigned to me (Case No. 14-C-1423).

By 2016, all cases were assigned to me and being administered jointly as a single litigation, even though the separate case numbers were not formally consolidated for all purposes under Federal Rule of Civil Procedure 42(a). The plaintiffs were all represented by the same counsel and waged a coordinated campaign. In April 2016, I entered a case management order under which the claims of three plaintiffs—Burton, Owens, and Sifuentes—were to be prepared for trial first. (ECF No. 352 in 07-C-0303.) These are the "first wave" plaintiffs. The same order contemplated a second wave of cases to be prepared for trial, but it did not identify the specific plaintiffs to be included in that wave.

By 2018, the defendants had filed motions for summary judgment on the claims of the first-wave plaintiffs. The claims of those plaintiffs (and all 160+ plaintiffs, for that matter) were for negligence and strict liability. To satisfy certain elements of both their negligence and strict-liability claims, the plaintiffs sought to establish that the

5

manufacturers of white lead carbonate had a duty to warn consumers about the dangers of ingesting their product. With respect to negligence, the plaintiffs argued that the defendants' failure to warn resulted in a breach of a legally recognized duty. With respect to strict liability, the plaintiffs argued that the failure to warn amounted to a product defect.

In moving for summary judgment, the defendants[2] argued that the legal standard for determining whether they had a duty to warn was the same for both the negligence and the strict-liability claims. The defendants further argued that, under this single standard, manufacturers of white lead carbonate had no duty to warn the plaintiffs or their caregivers about the dangers of lead-based paint because, by the time the plaintiffs were living in their homes in the 1990s and early 2000s, the public was well aware of those dangers. This public knowledge, the defendants argued, gave them reason to believe that those who consumed its products would realize its dangerous condition. Under Wisconsin law, a defendant who has reason to believe that the dangerous condition of its product would be known to consumers cannot be liable for failing to provide a warning. *See Strasser v. Transtech Mobile Fleet Serv., Inc.*, 236 Wis. 2d 435, 460–61 (2000) (quoting Restatement (Second) of Torts, § 388 (1965)).

When I decided the defendants' motions for summary judgment on the claims of the first-wave plaintiffs, I separated the duty-to-warn issue in the negligence context from the duty-to-warn issue in the strict-liability context. *See Burton v. American Cyanamid*, 334 F. Supp. 3d 949, 961–67 (E.D. Wis. 2018). With respect to negligence, I stated that, to survive summary judgment, "each plaintiff must establish that the defendant

---

[2] The arguments I describe here were made primarily be defendant Sherwin-Williams Co. However, all defendants would eventually adopt Sherwin-Williams' position.

manufacturers owed a duty to that plaintiff to warn him or her (or his or her parents and caregivers) of the risks associated with [white lead carbonate] when used for residential paint." *Id.* at 961. I also recognized that, under Wisconsin law, a defendant who has "reason to believe" that consumers of its product "will realize its dangerous condition" does not have a duty to warn. *Id.* I then concluded that the plaintiffs could not satisfy their burden to prove that the defendants "'had no reason to believe' that plaintiffs or their caregivers would realize that the pigment on their walls was dangerous." *Id.* I reasoned as follows:

> [A]s plaintiffs acknowledge, Sherwin Williams and other paint manufacturers had issued product warnings since at least 1955, while federal, state and local governments have warned of risks of lead in the homes since the 1970s. Defendants therefore had ample reason to believe that persons residing in homes with older paint would be aware of the toxicity of the lead compounds possibly in the paint, and of the various mechanisms by which that lead might be ingested. Deposition testimony of plaintiffs' witnesses supports this point, as parents or caregivers of each plaintiff testified that they knew, before each plaintiff's lead exposure, that children should not eat paint chips because of the risk of lead exposure. I therefore conclude that the defendants did not owe a duty to plaintiffs or their caregivers to warn them directly of the risks associated with [white lead carbonate] in residential paint. Plaintiffs are therefore foreclosed from pursuing negligence claims that rely on a duty to warn theory.

*Id.* (citations omitted).[3]

With respect to strict liability, I reached a different result. I first recognized that, to prevail on their strict-liability claims, the plaintiffs had to produce evidence "sufficient to raise a question of fact as to whether the hazards of WLC in paint were 'dangerous to an

---

[3] I also concluded that although the plaintiffs were foreclosed from pursuing negligence claims based on the lack of warnings, the plaintiffs could "continue to pursue negligence claims based on the general duty of ordinary care." *Id.* The Seventh Circuit would later reverse this part of my decision. *See Burton v. E.I. DuPont de Nemours & Co.*, 994 F.3d 791, 817–20 (7th Cir. 2021).

7

extent beyond that which would be contemplated by the ordinary consumer who purchases it.'" *Id.* at 962. Crucially, I determined that "[t]he 'ordinary consumer' in question here must be understood as the ordinary consumer who purchased or used WLC or paint containing WLC during the years that Sherwin-Williams made WLC, *i.e.*, 1910–1947." *Id.* Focusing on consumer knowledge in 1910–1947 set the strict-liability claim apart from the negligence claim, which, according to me, depended on consumer knowledge in the 1990s and early 2000s, when the plaintiffs were occupying homes covered with lead paint. Having identified the period of 1910–1947 as the relevant period for strict liability, I then found that the plaintiffs had adduced evidence "sufficient to create a triable question of fact whether ordinary consumers and users of paint during [that period] would have contemplated the risk that deteriorating paint would cause children to be exposed to lead." *Id.* at 963. More specifically, I found that the jury could conclude that, between 1910 and 1947, "the public was not fully informed about lead poisoning and the mechanisms of exposure, and [that] therefore the extent of the risks known to Sherwin-Williams would not have been contemplated by consumers and users of paint at the time." *Id.*

In May 2019, the claims of the three first-wave plaintiffs went to trial against the five defendants remaining in the case at that time. Those defendants were American Cyanamid Co., E.I. du Pont de Nemours and Company, Inc., the Sherwin-Williams Company, Armstrong Containers, Inc., and Atlantic Richfield Company. During the trial, I dismissed American Cyanamid from the case for lack of personal jurisdiction, and so the claims against it were not submitted to the jury. I would later dismiss American Cyanamid from all cases for lack of personal jurisdiction, reasoning that all plaintiffs in all cases were bound by the outcome of the first-wave claims against American Cyanamid under the

8

doctrine of issue preclusion. (ECF No. 364 in No. 11-C-1155.) The jury found three of the four remaining defendants (DuPont, Sherwin-Williams, and Armstrong) liable for both negligence and strict liability and awarded the plaintiffs $2 million each. Those three defendants appealed.

While the appeal of the result of the first-wave trial was pending, the parties filed motions for summary judgment in the "second wave" cases. By this time, four second-wave plaintiffs had been chosen. These plaintiffs were three of the 160 plaintiffs from *Allen* (Latoya Cannon, D'Angelo Thompson, and Tyann McHenry) and one of the three plaintiffs from *Trammell* (Dijonae Trammell). As is relevant here, the defendants argued that summary judgment should be granted on the second-wave plaintiffs' negligence claims based on the duty to warn for the same reason that it was granted on the same claims of the first-wave plaintiffs, namely, because the plaintiffs could not produce evidence from which a jury could reasonably infer that the defendants had no reason to believe that the plaintiffs or their caregivers were unaware of the dangers of lead paint in the 1990s and early 2000s. (*See* Sherman-Williams Br. in Supp. at 4–5, ECF No. 801 in No. 11-C-0055.) In response to this argument, the second-wave plaintiffs conceded that the defendants were entitled to summary judgment on their claims for negligent failure to warn. Specifically, the plaintiffs included this footnote in their brief in opposition to the motion for summary judgment:

> Sherwin-Williams initially argues that Plaintiffs have no claim for negligent failure to warn. (See SW MSJ at 4-5.) Well aware of this Court's previous order, *see Burton v. American Cyanamid*, 334 F. Supp. 3d 949, 961 (E. D. Wis. 2018) ("*Burton II*"), Plaintiffs concede that they do not have surviving claims for negligent failure to warn.

9

(Pls.' Br. in Opp. at 5 n.8, ECF No. 914 in No. 11-C-0055.) In my decision on the motion for summary judgment in the second-wave cases, I reiterated my conclusion from the first-wave cases that, given the public knowledge of the dangers of lead paint in the 1990s and early 2000s, the plaintiffs were foreclosed from pursuing negligence claims that relied on a duty-to-warn theory. *See Allen v. American Cyanamid*, 527 F. Supp. 3d 982, 996–97 (E.D. Wis. 2021). However, I continued to draw a distinction between the duty to warn under negligence and the duty to warn under strict liability. Thus, as I did in the first-wave cases, I allowed the plaintiffs to proceed on their strict-liability failure-to-warn claims based on the possibility that consumers in the period 1900 to 1950 were unaware of the dangers posed by lead-based paint. *See id.* at 995–96.

In April 2021, shortly after I decided the motions for summary judgment on the claims of the second-wave plaintiffs, the Seventh Circuit issued its decision in the appeal involving the claims of the first-wave plaintiffs. *See Burton v. E.I. du Pont de Nemours & Co.*, 994 F.3d 791 (7th Cir. 2021). This decision contains several holdings that are relevant to the present motions for summary judgment. However, the most significant holding for the future of this litigation is the court's rejection of my conclusion that the legal standard governing claims for failure to warn in the strict-liability context is different from the standard governing claims for failure to warn in the negligence context. The court concluded that, for purposes of both negligence and strict liability, the necessity of warnings turned on "what the ultimate consumer (i.e., the plaintiffs or their caregivers) knew, rather than what consumers in general knew at the time the manufacturer released the product into the market." *Id.* at 823. The court found that I "legally erred in finding that the defendants had a duty to warn for purposes of strict liability after ruling at summary

10

judgment that they had no duty to warn the plaintiffs on their negligence claims." *Id.* Further, the court noted, the plaintiffs did not appeal my ruling that the defendants had no duty to warn for purposes of the negligence claims. *Id.* The court thus held that my ruling on the negligence claims "compels judgment as a matter of law for [the defendants] on the strict liability claims." *Id.*

## B.   Current Motions

After the Seventh Circuit remanded the claims of the first-wave plaintiffs to this court, the remaining defendants filed renewed motions for summary judgment based on the court's rulings. These motions apply to all plaintiffs in all seven cases. However, distinguishing among the various "waves" of plaintiffs is still relevant, as the reasons the defendants offer for granting summary judgment vary based on wave.

Regarding the first wave, only three defendants remain: Sherwin-Williams, Armstrong, and DuPont. The Seventh Circuit held that Sherwin-Williams is entitled to judgment as a matter of law on all claims that went to trial during that wave. Thus, the first-wave claims against it are no longer viable, and all that remains is to enter judgment in its favor. The Seventh Circuit held that Armstrong is entitled to judgment as a matter of law on the strict-liability claims and a new trial on the negligence claims, and that DuPont is entitled to a new trial on both claims. Armstrong and DuPont now move for summary judgment on the claims that were remanded for a new trial, and the first-wave plaintiffs have not opposed summary judgment on such claims.

Regarding the second wave, all four defendants (Sherwin-Williams, Armstrong, DuPont, and Atlantic Richfield) contend that they are entitled to summary judgment on all claims within that wave. Their motions are based primarily on my determination in the

11

prior motion for summary judgment in the second-wave cases that manufacturers of white lead carbonate had no duty to warn modern consumers about the dangers of lead-based paint because, by the 1990s and early 2000s, those dangers were well known. Although my determination originally affected only the plaintiffs' negligence claims, the Seventh Circuit's intervening decision—which holds that the existence of a duty to warn in both the negligence and the strict-liability contexts must be determined based on the knowledge of consumers in the 1990s and early 2000s—makes my determination dispositive of both claims. And the second-wave plaintiffs do not dispute that, if my prior determination is left intact, then the defendants would be entitled to summary judgment on all second-wave claims. However, the second-wave plaintiffs ask me to reconsider my prior determination that modern consumers were sufficiently aware of the dangers of lead-based paint such that no warning from the defendants was required.

The plaintiffs' request for reconsideration is based on evidence they produced for the first time in opposition to the current motions for summary judgment. The plaintiffs contend that this evidence would allow a reasonable jury to find that, although modern consumers may have been aware of some of the dangers of lead-based paint, they were not aware of a specific danger involving lead dust. Here, the plaintiffs submit evidence suggesting that, while modern consumers were generally aware that lead was toxic and that the ingestion of paint chips containing lead could lead to lead poisoning, such consumers were not aware of the dangers posed by the lead dust that formed when paint on the home's surfaces deteriorated. Unlike paint chips, lead dust was virtually invisible, and studies in the 1970s began to show that young children picked up and carried the dust to their mouths during normal hand-to-mouth activities. The plaintiffs contend that,

12

because in the 1990s and early 2000s the dangers of lead dust were not as well publicized as the dangers of lead chips or the general toxicity of lead-based paint, a jury could reasonably find that the defendants had reason to know that modern consumers required warnings to fully understand the dangers of white lead carbonate.

As for the remaining plaintiffs—that is, all plaintiffs other than those in the first and second waves—the defendants move for summary judgment based on the doctrines of law of the case and issue preclusion.[4] With respect to each doctrine, the defendants focus on my determination involving the first- and second-wave claims that consumers in the 1990s and early 2000s did not require warnings about the dangers of lead paint. The doctrine of law of the case would apply to any plaintiff deemed to be part of the same "case" as the plaintiffs in the second wave.[5] Because the claims of some plaintiffs from *Allen* and *Trammell* were litigated during the second wave, law of the case potentially applies to all 150+ remaining plaintiffs in *Allen* and the two remaining plaintiffs in *Trammell*. The doctrine of issue preclusion, in turn, would apply to the plaintiffs in cases that were not part of the second wave. Only three plaintiffs fall into this category: the two plaintiffs in *Valoe* and the sole plaintiff in *Gibson*.[6]

---

[4] With respect to all claims, the defendants also move for summary judgment on other grounds, such as that the plaintiffs' new evidence would not permit a jury to find in their favor on the duty-to-warn issue. However, because the defendants will prevail based on law of the case and issue preclusion, I do not discuss the other grounds raised in their motions.

[5] The plaintiffs in the first wave each brought their own case under separate case numbers, and so there are no remaining plaintiffs in those cases. Thus, law of the case is not relevant to the first wave.

[6] An argument could be made that law of the case applies to the plaintiffs in *Valoe* and *Gibson*, and that issue preclusion applies to the remaining plaintiffs in *Allen* and *Trammell*. However, for purposes of this decision, I will assume that the binding effect of my duty-

13

The remaining plaintiffs contend that I may not use law of the case or issue preclusion to bar them from relitigating the issue of whether the defendants had a duty to warn consumers in the 1990s and early 2000s of the dangers of white lead carbonate. I discuss their specific arguments below.

## II. DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

### B.    Remaining First-Wave Issues

Because the Seventh Circuit remanded the claims of the first-wave plaintiffs for further proceedings, I must tie up the loose ends that remain in that wave. First, the Seventh Circuit held that Sherwin-Williams was entitled to judgment on all first-wave claims, and therefore I will direct entry of judgment in its favor on those claims. Second, although the Seventh Circuit remanded certain first-wave claims against DuPont and Armstrong for a new trial, the first-wave plaintiffs have not opposed these defendants' renewed motions for summary judgment. Accordingly, I will grant those motions and direct entry of judgment on all remaining claims of the first-wave plaintiffs.

---

to-warn determination could apply to the remaining plaintiffs in *Allen* and *Trammell* only through law of the case, and that it could apply to the plaintiffs in *Valoe* and *Gibson* only through issue preclusion.

14

**C.      Second-Wave Plaintiffs: Motion for Reconsideration**

The second-wave plaintiffs ask that I reconsider my decision at summary judgment that the defendants did not have a duty to warn consumers in the 1990s and early 2000s about the dangers of white lead carbonate. *See Allen*, 527 F. Supp. 3d at 996–97. These plaintiffs cite Federal Rule of Civil Procedure 54(b), which provides that any order or decision "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Although this rule grants me the power to reconsider any nonfinal order, *see Cameo Convalescent Ctr., Inc. v. Percy*, 800 F.2d 108, 110 (7th Cir. 1986), and although the summary-judgment order at issue here is nonfinal for purposes of Rule 54(b), reconsideration is a power to be used sparingly and only in appropriate circumstances. As the Seventh Circuit has stated, "[m]otions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996).

In seeking reconsideration, the second-wave plaintiffs argue that "[t]he facts supporting Defendants' duty to warn of the hidden dangers of lead dust justify relief from the Court's summary judgment ruling." (Pls.' Br. in Opp. at 25, ECF No. 1108 in No. 11-C-0055.) The problem with this argument is that the plaintiffs did not present the facts on which they now rely to the court during proceedings on the original motion for summary judgment. During the initial round of summary judgment in the second-wave cases, the plaintiffs conceded that consumers in the 1990s and early 2000s were aware of the dangers of lead-based paint and therefore did not require warnings. (Pls.' Br. in Opp. at 5 n.8, ECF No. 914 in No. 11-C-0055.) Having conceded this point, the plaintiffs did not

15

point me to evidence suggesting that modern consumers might have been unaware of the dangers posed by lead dust. Thus, in my decision, I specifically found that manufacturers of white lead carbonate "had ample reason to believe that persons residing in homes with older paint would be aware of the toxicity of the lead compounds possibly in their paint, *and of the various mechanisms by which that lead might be ingested*." *Allen*, 527 F. Supp 3d at 997 (emphasis added). Such mechanisms would include ingestion of lead dust. Accordingly, my original decision, which was based on the record compiled at the time and on the arguments that the plaintiffs actually made at the time, was undoubtedly correct. There was no manifest error of law or fact.

Although the plaintiffs now present new evidence regarding the modern consumer's lack of knowledge of the dangers of lead dust, that evidence does not qualify as "newly discovered evidence" for purposes of a motion for reconsideration. Such a motion cannot "be employed as a vehicle to introduce new evidence that could have been adduced during the pendency of the [original] summary judgment motion." *Caisse Nationale*, 90 F.3d at 1269. To support a motion for reconsideration based on newly discovered evidence, the moving party must show not only that this evidence was newly discovered or unknown to it until after the original proceeding, but also that it could not with reasonable diligence have discovered and produced such evidence during the original proceeding. *Id*. Here, the second-wave plaintiffs do not argue that the evidence they now present was unknown to them during prior proceedings or that they could not with reasonable diligence have discovered or produced that evidence prior to the summary-judgment phase of the second wave. To the contrary, they concede that "[t]his litigation is and always has been focused on the hidden dangers of [white lead carbonate],

16

specifically including those presented by invisible household dust." (Pls.' Br. in Opp. at 11, ECF No. 1108 in No. 11-C-0055.) That being the case, the plaintiffs were well-equipped to argue, during the prior round of summary judgment, that the defendants had a duty to warn consumers in the 1990s and early 2000s about the dangers of lead dust. However, the plaintiffs chose not to press this argument, perhaps because they believed that my more favorable ruling on the duty to warn in the strict-liability context would hold up on appeal. The plaintiffs' having made a strategic choice that they wish to change is not grounds for reconsideration. Again, the Seventh Circuit's opinion in *Caisse Nationale* is controlling:

> A party seeking to defeat a motion for summary judgment is required to "wheel out all its artillery to defeat it." Belated factual or legal attacks are viewed with great suspicion, and intentionally withholding essential facts for later use on reconsideration is flatly prohibited. Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion.

90 F.3d at 1270 (citations omitted). Here, the distinction between consumer knowledge of the dangers of lead chips and the dangers of lead dust could have been raised and argued during the pendency of the previous motion. Accordingly, I will not now reconsider that ruling in light of the plaintiffs' belated factual and legal attacks.

The Seventh Circuit held that, for purposes of both negligence and strict liability, the requirement of warnings turns on what the defendants had reason to believe about the knowledge of consumers in the 1990s and early 2000s. *Burton*, 994 F.3d at 821–83. This holding is binding on all plaintiffs as a matter of *stare decisis*. *See Wesbrook v. Ulrich*, 840 F.3d 388, 399 (7th Cir. 2016) (Seventh Circuit interpretation of state law has *stare decisis* effect unless state courts call the interpretation into question). Because I

17

previously determined that the defendants were not required to warn consumers in that period about the dangers of white lead carbonate—including the dangers of lead dust—and because there are no grounds for reconsidering that determination, it follows that all defendants are entitled to summary judgment on all claims of the second-wave plaintiffs.[7]

### D. Remaining *Allen* and *Trammell* Plaintiffs: Law of the Case

The next question is whether my decision, rendered at summary judgment during the second wave, that the defendants did not have a duty to warn consumers in the 1990s and early 2000s about the dangers of white lead carbonate, applies to the remaining plaintiffs in *Allen* and *Trammell* as law of the case. Again, this question arises because the second wave included plaintiffs from *Allen* and *Trammell*, and thus the decision at issue was rendered under the caption for each of those cases.

The term "law of the case" expresses the general practice of courts to refuse to reopen, during later stages of the same case, matters that have already been decided. *See Messenger v. Anderson*, 225 U.S. 436, 444 (1912); *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995). The Seventh Circuit has described the doctrine as a "presumption, one whose strength varies with the circumstances." *Avitia*, 49 F.3d at 1227. The doctrine is not a straitjacket. *Id.* In general, courts recognize three circumstances that justify departing from the law of the case: (1) discovery of new evidence that the party could not have obtained through reasonable effort earlier, (2) an intervening change in the law, and (3) the earlier decision was clearly erroneous. *Kathrein*

---

[7] All other pending motions relating to the second-wave plaintiffs will be denied as moot.

*v. City of Evanston, Ill.*, 752 F.3d 680, 685 (7th Cir. 2014); *Vidimos, Inc. v. Wysong Laser Co., Inc.*, 179 F.3d 1063, 1065 (7th Cir. 1999).

At the outset, the remaining plaintiffs in *Allen* and *Trammell* contend that the doctrine of law of the case does not apply to their claims because they were not part of the same "case" as the claims of the second-wave plaintiffs. But this is clearly incorrect. Although the remaining plaintiffs have their own *claims*, they chose to bring those claims within the *cases* of *Allen* and *Trammell*. Specifically, all plaintiffs in *Allen* and *Trammell* elected to take advantage of Federal Rule of Civil Procedure 20(a)(1), which provides that "[p]ersons may join in *one action* as plaintiffs" if certain circumstances are satisfied. (Emphasis added.) In this context, the term "action" is a synonym for "case." *See Case*, *Black's Law Dictionary* (11th ed. 2019). Thus, all plaintiffs in *Allen* are formally parties to the same case, as are all plaintiffs in *Trammell*.[8]

Beyond the formal meaning of the term "case," it is also fair to bind the remaining plaintiffs in *Allen* and *Trammell* to the prior rulings I made on common questions of law or fact. One of the prerequisites to joinder is that a "question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1). The purpose of permitting joinder when there are common questions is "to enable economies in litigation." *Elmore v.*

---

[8] To support their argument that they are not subject to law of the case, the plaintiffs cite *Insolia v. Philip Morris Inc.*, 216 F.3d 596 (7th Cir. 2000), for the proposition that "the Seventh Circuit has explicitly held that each plaintiff must be afforded an opportunity to prove his or her own case." (Pls.' Br. in Opp. at 26.) However, *Insolia* does not suggest that each plaintiff whose claims were joined under Rule 20(a)(1) may separately litigate common questions of law or fact. The passage the plaintiffs cite was referring to the possibility of hypothetical future plaintiffs proving matters that the current plaintiffs were unable to prove. *See Insolia*, 216 F.3d at 603 (stating that, while current plaintiffs failed to prove that the ordinary consumer in 1935 and in the early 1950s did not appreciate the health risks of smoking, "[a]nother record in another case might be different").

*Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000). Here, the state of consumer knowledge in the 1990s and early 2000s about the dangers of lead paint is one such common question, and I answered that question in my summary-judgment order on the claims of the second-wave plaintiffs.[9] Allowing the remaining 150+ plaintiffs in *Allen* and *Trammell* to separately relitigate this issue as part of their own claims would destroy the efficiency that provided the justification for joinder in the first place. Indeed, when, earlier in this suit, the defendants moved to dismiss or sever the claims in *Allen* as misjoined, the plaintiffs identified the efficiency of litigating the "numerous" common questions of law or fact in a single action as a reason to permit joinder. (Pls.' Br. in Opp. to Misjoinder at 10, ECF No. 100 in No. 11-C-0055; *id.* at 15 (arguing that "judicial resources will actually be conserved and not wasted by maintaining the parties to this case as they are at present")). The plaintiffs even described "[p]roof of the failure to warn elements" as being "particularly conducive" to common resolution. (*Id.* at 14.) Having been permitted to proceed jointly on this question, the plaintiffs cannot now claim that it is unfair to bind them to the common answer. *Cf. Looper v. Cook Inc.*, 20 F.4th 387, 397 (7th Cir. 2021) (noting that, in light of "the common ground among the cases that justifies the use of the MDL [*i.e.*, multidistrict litigation] process in the first place," it would be unfair to allow a party to contradict its prior position on a common issue of law or fact within the MDL).

---

[9] Technically, I answered that common question in my summary-judgment decision on the claims of the first-wave plaintiffs and then applied that common answer to the second-wave plaintiffs when those plaintiffs did not argue for a different result. But the important point is that the common question has been answered for purposes of the *Allen* and *Trammell* cases.

20

Having determined that my prior decision regarding the duty to warn consumers in the 1990s and early 2000s about the dangers of white lead carbonate is law of the case for purposes of the *Allen* and *Trammell* cases, I now examine whether one of the three general circumstances that justify departing from the law of the case applies. The first circumstance is discovery of new evidence that the plaintiffs could not have reasonably produced prior to the decision that is law of the case. *See Vidimos*, 179 F.3d at 1065. Here, as I explained in Part II.C, the plaintiffs have not shown that the distinction they now seek to draw between consumer knowledge of the dangers of lead chips and the dangers of lead dust is based on evidence they could not have adduced in opposition to the original motions for summary judgment. Thus, the exception for newly discovered evidence does not apply.

The second circumstance is an intervening change in the law. Here, the plaintiffs point to the Seventh Circuit's decision in the first-wave cases as a potential change in the law or another "special circumstance" that warrants departure from the law of the case. (Pls.' Br. in Opp. at 28–29 & n.11.) But the Seventh Circuit did not change the legal standards that govern whether a manufacturer has a duty to warn for purposes of a negligence claim. Instead, the court applied the same law that I applied. *See Burton*, 994 F.3d at 822 ("In a negligence action, a manufacturer is not liable unless it 'has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition.' *Strasser v. Transtech Mobile Fleet Serv., Inc.*, 236 Wis.2d 435 (quoting Restatement (Second) of Torts § 388 (1965))."). It is true that the Seventh Circuit disagreed with my interpretation of Wisconsin law on the issue of which consumers matter for purposes of determining whether warnings were required in the context of a strict-

21

liability claim—I said that consumers from 1900–1950 mattered, but the Seventh Circuit held that consumers from the 1990s and early 2000s mattered. *Id.* at 823. But that change in the law does not affect the factual question regarding what consumers in the 1990s or early 2000s knew about the dangers of lead paint. Thus, the intervening decision from the Seventh Circuit does not warrant a departure from the law of the case.

The final circumstance for setting aside the law of the case is when the court is convinced that its earlier ruling was erroneous. *Avitia*, 49 F.3d at 1227 ("A judge may reexamine his earlier ruling (or the ruling of a judge previously assigned to the case, or of a previous panel if the doctrine is invoked at the appellate level) if he has a conviction at once strong and reasonable that the earlier ruling was wrong, and if rescinding it would not cause undue harm to the party that had benefited from it."); *Philips Med. Sys. Int'l B.V. v. Bruetman*, 8 F.3d 600, 603 (7th Cir. 1993) (doctrine of law of the case does not prevent court from correcting "demonstrable errors"). However, as I explained in Part II.C, my decision could not have been erroneous because the plaintiffs conceded that consumers in the 1990s and early 2000s were aware of the dangers of lead-based paint and therefore did not require warnings. (Pls.' Br. in Opp. at 5 n.8, ECF No. 914 in No. 11-C-0055.) Having conceded this point, the plaintiffs did not point me to evidence suggesting that modern consumers might have been unaware of the dangers posed by lead dust. Thus, my original decision, which was based on the record compiled at the time and on the arguments that the plaintiffs actually made at the time, was undoubtedly correct.

Ultimately, the only reason the plaintiffs can offer for departing from the law of the case is that, given the Seventh Circuit's opinion in the first-wave cases, my determination regarding the knowledge of modern consumers is now dispositive of both the negligence

and the strict-liability claims instead of only the negligence claims. But this change in the significance of the determination is not itself a circumstance that justifies reopening a settled question. Notably, at the time I made the original determination, the issue was not insignificant. The plaintiffs' claims for negligent failure to warn depended on it, and the plaintiffs were not guaranteed a victory on their other negligence claims or on their strict-liability claims. Thus, the plaintiffs had every incentive and opportunity to demonstrate, at the time of summary judgment in the second-wave cases, that a reasonable jury could find that the defendants had reason to believe that consumers in the 1990s and early 2000s were unaware of the dangers of lead dust, even if those same consumers were aware of the dangers of lead paint generally. But instead of developing an argument along those lines, the plaintiffs conceded the issue and focused on other arguments. Although I do not criticize the plaintiffs for adopting this strategy—indeed, that strategy might have given the plaintiffs their best odds of success—a party's desire to change legal strategy during a later stage of the case does not justify a departure from the law of the case. *See Burley v. Gagacki*, 834 F.3d 606, 619 (6th Cir. 2016).

In short, I conclude that the remaining plaintiffs in *Allen* and *Trammell* are bound by my prior determination that the defendants had no duty to warn children or their caregivers in the 1990s and later of the dangers of white lead carbonate, including the dangers of lead dust. *See Allen*, 527 F. Supp. 3d at 997. In light of that determination, the defendants are entitled to summary judgment on such plaintiffs' claims for negligence and strict liability.

23

**E.** *Valoe* and *Gibson*: **Issue Preclusion**

The final question is whether my decision in the second-wave cases regarding the knowledge of modern consumers binds the remaining three plaintiffs: Deziree and Detareion Valoe and Ernest Gibson. These plaintiffs were not formal parties to *Allen* or *Trammell* or any of the first-wave cases, and thus it is at least arguable that the doctrine of law of the case does not bind them to the prior ruling made in those cases. However, the plaintiffs in *Valoe* and *Gibson* share the same interests as the plaintiffs in in *Allen*, *Trammell*, and the first-wave cases, and they are represented by the same attorneys, who have pursued a common strategy across all cases. The defendants argue that, in light of these facts, the plaintiffs in *Valoe* and *Gibson* are bound by my decision in the second-wave cases under the doctrine of issue preclusion.

The doctrine of issue preclusion (formerly known as collateral estoppel), like the doctrine of claim preclusion (formerly known as *res judicata*), determines the preclusive effect of a prior judgment. When the judgment at issue was rendered by a federal court, its preclusive effect is determined by federal common law. *Taylor v. Strugell*, 553 U.S. 880, 891 (2008). However, when the federal court rendered the judgment while sitting in diversity, federal common law incorporates the rules of preclusion that would be applied by the state courts of the state in which the federal court sits. *Id.* at 891 n.4; *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001). Thus, to determine whether the plaintiffs in *Valoe* and *Gibson* are subject to issue preclusion, I apply Wisconsin law.

Issue preclusion "is a doctrine designed to limit the relitigation of issues that have been contested in a previous action between the same or different parties." *Michelle T. by Sumpter v. Crozier*, 173 Wis. 2d 681, 687 (1993). When applying the doctrine, "courts

24

balance competing goals of judicial efficiency and finality, protection against repetitious or harassing litigation, and the right to litigate one's claims before a jury." *Id.* at 688. Under Wisconsin law, a two-step analysis is used to determine whether issue preclusion applies: first, the court asks whether issue preclusion can, as a matter of law, be applied; if so, the court then asks whether the application of issue preclusion would be fundamentally fair. *In re Estate of Rille ex rel. Rille*, 300 Wis. 2d 1, 19 (2007). In the first step, a court must determine "whether the issue or fact was actually litigated and determined in the prior proceeding by a valid judgment in a previous action and whether the determination was essential to the judgment." *Id.* at 20. Where, as here, a party seeks to apply issue preclusion against a person who was not a formal party to the prior action, the first step also requires that the court determine whether the person was "in privity with or had sufficient identity of interest" with a person who was a party to that action such that applying issue preclusion would comport with due process. *Paige K.B. ex rel. Peterson v. Steven G.B.*, 226 Wis. 2d 210, 224 (1999). In the second step, a court considers five factors, "which are not exclusive or dispositive," in determining whether application of issue preclusion is fundamentally fair. *Rille*, 300 Wis. 2d at 20.

Before turning to this two-step analysis, I pause to consider whether any "judgment" has been entered in the second-wave cases that could have issue preclusive effect. The plaintiffs do not dispute that such a judgment has been entered, but I raise this issue on my own because a final judgment under Federal Rules of Civil Procedure 54 and 58 has not been entered in the second-wave cases. Thus, my summary-judgment decision in the second-wave cases is not final for purposes of appellate review. However, "it is a mistake to equate the concept of finality for purposes of appellate review with the

25

concept of finality for purposes of issue preclusion." *Haber v. Biomet, Inc.*, 578 F.3d 553, 557 (7th Cir. 2009). The finality requirement for appellate review ensures that court resources are used efficiently and that the appellate court sees the entire case. *Id.* The finality requirement in issue preclusion also serves efficiency, but in a different way: "by ensuring that parties who have fully and fairly litigated a particular issue (which is expressly resolved and necessary to the outcome) do not receive more than one bite at the apple." *Id.* Courts generally follow the Restatement of Judgments when determining finality for purposes of issue preclusion, which states that "'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." Restatement (Second) of Judgments § 13 (Am. Law Inst. 1982); *see Coleman v. Comm'r*, 16 F.3d 821, 830 (7th Cir. 1994) (following this section of the Restatement); *Rille*, 300 Wis. 2d at 24 n.24 ("Wisconsin courts have consistently relied on the Restatement (Second) Judgments for guidance when deciding questions related to issue preclusion.").

Here, I conclude that my determination at summary judgment in the second wave on the issue of modern consumer knowledge of the dangers of white lead carbonate was sufficiently firm to be accorded preclusive effect. That decision was not in any way tentative or uncertain; rather, I rendered it after the parties were fully heard, and I supported the decision with a reasoned opinion. Moreover, the Wisconsin Supreme Court has held that "[a] summary judgment in favor of the defendant is sufficient to meet the requirement of a conclusive and final judgment." *Rille*, 300 Wis. 2d at 24 (quoting *DePratt v. West Bend Mut. Ins. Co.*, 113 Wis.2d 306, 310–11, (1983)). This holding appeared in a case in which the summary judgment was given issue preclusive effect within "the four

26

corners of the same lawsuit." *Id.* at 21. Thus, the Wisconsin Supreme Court would give preclusive effect to my summary-judgment decision in the second-wave cases even though I have yet to enter final judgment under Rules 54 and 58 on the claims of the second-wave plaintiffs.[10]

Having determined that my decision at summary judgment is final for purposes of issue preclusion, I return to the two-step analysis governing whether that doctrine should be applied. First, I examine whether issue preclusion may be applied as a matter of law. Here, there is no dispute that the issue of whether a jury could reasonably find that consumers in the 1990s and early 2000s were unaware of the dangers of white lead carbonate, such that the defendants were required to issue warnings, was actually litigated and determined at summary judgment in the second-wave cases. There is also no dispute that the determination of this issue was essential to the judgment. Thus, these elements of issue preclusion are satisfied. *See Rille*, 300 Wis. 2d at 20.

The plaintiffs contend that the judgment in the second-wave cases cannot be applied to them because they were not formal parties to those cases. As noted, however, Wisconsin does not require formal identity of parties. Rather, even if the person sought to be precluded was not a party to the prior action, issue preclusion may apply if the person was "in privity with or had sufficient identity of interest" with a person who was a party to that action such that applying issue preclusion would comport with due process. *Paige K.B.*, 226 Wis. 2d at 224. Wisconsin courts have applied this rule to sequential

---

[10] Even if a final judgment under Rules 54 and 58 were required, it will be entered immediately after this order is docketed, in accordance with my decision regarding law of the case. This underscores that my summary-judgment decision on the duty to warn is sufficiently firm to be accorded preclusive effect.

27

litigation by related plaintiffs in personal-injury suits. Specifically, in *Jensen v. Milwaukee County Mutual Insurance Co.*, 204 Wis. 2d 231 (Ct. App. 1996), the Wisconsin Court of Appeals held that a husband's litigation of issues arising out of a car accident against the driver of another vehicle and his liability insurer had preclusive effect in a subsequent suit brought by his wife, who was a passenger in the vehicle driven by the husband, against the same driver's insurer. The court noted that the wife had an "obvious interest in the prior proceeding," and it emphasized that her choice of the same counsel who represented her husband showed that she "approve[d] of the tactics and strategy employed in [the prior] action." *Id.* at 239–40.[11]

In the present case, the plaintiffs in *Valoe* and *Gibson* are in a similar position as was the wife in *Jensen*. They had an "obvious interest" in the first- and second-wave cases, in that the plaintiffs were prosecuting claims against the same defendants under identical legal theories in front of the same court and the same judge, who had been managing all cases jointly. Further, the plaintiffs in *Valoe* and *Gibson* are represented by the same counsel as were the first- and second-wave plaintiffs, which shows that they approved of the tactics and strategy employed in the prior action. Indeed, in a prior order, I determined that, due to the identity of interests among all plaintiffs in these related actions, the plaintiffs in *Valoe* and *Gibson* (among others) were bound by issue preclusion

---

[11] In the absence of guiding decisions by the state's highest court, federal courts sitting in diversity consult and follow the decisions of intermediate appellate courts unless there is a convincing reason to predict that the state's highest court would disagree. *Smith v. RecordQuest, LLC*, 989 F.3d 513, 517 (7th Cir. 2021). Here, I see no convincing reason to predict that the Wisconsin Supreme Court would disagree with *Jensen*. To the contrary, the Wisconsin Supreme Court has discussed the holding of *Jensen* and did not suggest that it was wrongly decided. *See Paige K.B.*, 226 Wis. 2d at 228.

to my determination in the first-wave cases that defendant American Cyanamid was not subject to personal jurisdiction in Wisconsin. *See Allen v. Am. Cyanamid Co.*, No.11-C-0055, 2019 WL 5863979 (E.D. Wis. Nov. 8, 2019). In that order, I identified the "shared counsel" and "tightly coordinated litigation strategy between the present and prior plaintiffs" as reasons to find that the plaintiffs in later waves were bound by a first-wave decision on a common question. *Id.* at *3. As I did in that order, I now conclude that the plaintiffs in *Valoe* and *Gibson* had a "sufficient identity of interest" with the plaintiffs in the earlier waves such that, as a matter of Wisconsin law and due process, issue preclusion can be applied. *Paige K.B.*, 226 Wis. 2d at 226.[12]

Having found that issue preclusion can be applied as a matter of law, I turn to the second step and ask whether applying issue preclusion would be "fundamentally fair." *Rille*, 300 Wis. 2d at 19. When making this fairness determination, Wisconsin courts generally consider the following five non-exclusive and non-dispositive factors:

---

[12] I note that the Supreme Court of the United States has disapproved of the doctrine of "virtual representation," which has been used to bind nonparties to a judgment rendered in a prior action. *Taylor*, 553 U.S. at 885. However, the holding of *Taylor* applies only to "a federal-question case decided by a federal court." *Id.* at 904. As noted, this case is based on diversity and therefore is governed by Wisconsin's preclusion principles. The plaintiffs have not cited, and I have not found, any Wisconsin cases indicating that the Wisconsin Supreme Court would abandon the "sufficient identity of interest" test in light of *Taylor*. Moreover, this case presents a stronger case for nonparty preclusion than does the usual case involving virtual representation. Here, the plaintiffs essentially agreed to litigate their claims as part of a conglomeration of related cases being prosecuted by the same counsel in front of the same court and judge in a tightly coordinated manner. In contrast, virtual representation usually involves entirely separate litigation by parties with nothing more than similar litigation objectives and a loose relationship. *See id.* at 885–91. Thus, even if the Wisconsin Supreme Court would disapprove of the doctrine of virtual representation, I do not believe that it would hold that, as a matter of law, issue preclusion cannot apply to the *Valoe* and *Gibson* plaintiffs.

29

(1)    Could the party against whom preclusion is sought have obtained review of the judgment as a matter of law;

(2)    Is the question one of law that involves two distinct claims or intervening contextual shifts in the law;

(3)    Do significant differences in the quality or extensiveness of proceedings between the two courts warrant relitigation of the issue;

(4)    Have the burdens of persuasion shifted such that the party seeking preclusion had a lower burden of persuasion in the first trial than in the second; and

(5)    Are matters of public policy and individual circumstances involved that would render the application of collateral estoppel to be fundamentally unfair, including inadequate opportunity or incentive to obtain a full and fair adjudication in the initial action?

*Id.* at 20, 29.

Here, the first factor nominally favors the *Valoe* and *Gibson* plaintiffs, as they cannot force the second-wave plaintiffs to appeal my prior summary-judgment ruling. However, because all plaintiffs are represented by the same counsel and have been engaged in coordinated litigation, I have no doubt that, if any plaintiff in any wave saw grounds for appealing my prior ruling, then the second-wave plaintiffs would file an appeal.

Regarding the second factor, as I explained in the context of law of the case, there has not been a material change in the law since the time I decided the prior motions for summary judgment in the second wave. Although the Seventh Circuit's intervening decision in the first-wave cases altered some of my prior rulings, that decision did not disturb the legal principles that caused me to determine that the defendants had reason

to believe that modern consumers were fully aware of the dangers of white lead carbonate. Thus, the second factor favors the defendants.

Regarding the third factor, I see nothing in the quality or extensiveness of proceedings between "the two courts" that would warrant relitigation of the issue. Indeed, both cases were litigated before the same judge of the same court by the same counsel. And the proceedings in the first and second waves were extensive and of high quality. As noted, by the time I decided the duty-to-warn issue in the second wave, I had already considered it in the first wave. In both the first and the second waves, the plaintiffs were represented by highly qualified counsel who had ample time to research and investigate this issue and take whatever discovery they thought relevant to the issue.[13] Thus, the third factor favors the defendants.

Regarding the fourth factor, it clearly favors the defendants, as the burdens of persuasion have not shifted between the earlier waves and now.

Finally, as to the fifth factor, I see no matters of public policy or individual circumstances that would render the application of issue preclusion fundamentally unfair, such as an inadequate opportunity or incentive to obtain a full and fair adjudication in the prior proceeding. As I discussed in the context of law of the case, the second-wave

---

[13] I note that, during briefing on the current motions for summary judgment, I granted the plaintiffs leave to take additional discovery on the duty-to-warn issue. In my order granting such leave, I stated that "the remaining plaintiffs have not had an opportunity to conduct discovery into this issue." (ECF No. 1103 at 4.) However, the first- and second-wave plaintiffs did have an opportunity to take discovery on this issue, which is the important point for purposes of the third factor. Moreover, I issued the order for additional discovery before I had fully evaluated the defendants' positions on law of the case and issue preclusion. Now that I have done so, I believe that the remaining plaintiffs were not entitled to a separate round of discovery on this issue.

plaintiffs had every opportunity and incentive to show that a reasonable jury could find that the defendants had reason to believe that consumers in the 1990s and early 2000s were unaware of the dangers of lead dust, even if those same consumers were aware of the dangers of lead paint generally. That was so because their claims for negligent failure to warn depended on it and the plaintiffs were not guaranteed a victory on their other negligence claims or on their strict-liability claims. Thus, the adjudication in the prior proceeding was full and fair.

Perhaps most importantly, by the time the second-wave plaintiffs filed their brief in opposition to the defendants' motions for summary judgment on the duty-to-warn issue, I had already put all plaintiffs on notice that my decisions on common questions of law or fact would have issue preclusive effect across all the lead-paint claims in the related actions pending before me. That notice was my decision on American Cyanamid's motion to dismiss for lack of personal jurisdiction, which I issued in November 2019. As I discussed above, in that decision, I determined that all plaintiffs in the related cases were bound by the first-wave plaintiffs' litigation of the personal-jurisdiction issue, which was a common issue among all cases. In opposing the application of issue preclusion at that time, the plaintiffs (including those in *Valoe* and *Gibson*) claimed that it would be fundamentally unfair to apply issue preclusion against them because the plaintiffs in the first wave "did not understand that they were representing any other plaintiffs." *Allen*, 2019 WL 5863979, at *3. I rejected that argument and stated that it was not unfair to the other plaintiffs to give the jurisdictional ruling preclusive effect. Thus, by November 2019, all plaintiffs should have understood that the plaintiffs in the earlier proceedings *were* representing the plaintiffs in the later proceedings as to common questions of law or fact.

32

The plaintiffs filed their response to the defendants' motions for summary judgment on the second-wave claims on June 29, 2020. (ECF No. 914 in 11-C-155 and ECF No. 670 in 14-C-1423.) By that time, the plaintiffs in *Valoe* and *Gibson* should have known that their interests were at stake in the second-wave proceedings. Accordingly, it would not be fundamentally unfair to bind them to a decision on a common issue rendered in those proceedings.

Because issue preclusion applies to the plaintiffs in *Valoe* and *Gibson*, the defendants are entitled to summary judgment on their claims for negligent failure to warn and strict-liability failure to warn. Moreover, as a matter of *stare decisis*, the defendants are entitled to summary judgment on the plaintiffs' other negligence claims. *See Burton*, 994 F.3d at 817–20.

## III. CONCLUSION

Before concluding, I recognize that ending the claims of 150+ injured plaintiffs under the doctrines of law of the case and issue preclusion may seem harsh. But our system of litigation is built on the principle that parties are entitled one full and fair round of litigation on an issue. Further, when multiple plaintiffs join together and bring a series of related claims before the same court using the same counsel and legal strategies, principles of efficiency and fairness require that the plaintiffs receive only one opportunity to litigate common questions of law or fact. Allowing the plaintiffs to use the nature of a complex lawsuit to litigate common questions serially would give them an unfair advantage. The earliest plaintiffs could test a legal strategy and, if it fails, request reconsideration during further proceedings. Later plaintiffs, if not bound by the result of earlier proceedings, could repeatedly try out new approaches to common questions in

33

each wave of the proceedings. At the same time, the defendants, as formal parties to each case, would be forced to relitigate the same questions over and over. Indeed, there is no doubt that, had the plaintiffs prevailed on the duty-to-warn issue during the first and second waves, the defendants would be bound by that ruling in all waves. The fact that the earlier plaintiffs did not prevail does not justify giving the later plaintiffs a second bite at the apple when, all along, the plaintiffs have been aligned in interest and pursuing a common legal strategy through the same counsel. Moreover, permitting repetitive litigation on common questions would unnecessarily strain judicial resources and destroy the efficiencies that justified use of the common procedure in the first place. In short, principles of fairness, efficiency, and finality dictate that all plaintiffs and all defendants in these related actions be bound by the court's rulings on common questions of fact or law. Because the key common rulings have gone against the plaintiffs, the defendants are entitled to summary judgment.

For the reasons stated, **IT IS ORDERED** that defendant Sherwin-Williams' motion for leave to file its renewed motion for summary judgment at 11-cv-0055 at ECF No. 1085 and 14-cv-1423 ECF No. 759 is **GRANTED.**

**IT IS FURTHER ORDERED** that defendant Armstrong's motion for leave to file notice of joinder in Du Pont's renewed motion for summary judgment at 07-cv-0303 ECF No. 1830 is **GRANTED.**

**IT IS FURTHER ORDERED** that defendant Armstrong's motion for joinder at 11-CV-0055 ECF No. 1089 and 11-cv-0425 ECF No. 280 is **GRANTED.**

**IT IS FURTHER ORDERED** that defendant Du Pont's renewed motion for summary judgment at 07-cv-0303 ECF No. 1853 is **GRANTED.**

34

**IT IS FURTHER ORDERED** that defendant Atlantic Richfield's motion for summary judgment at 07-cv-0864 ECF No. 427, 11-cv-0425 ECF No. 270, and 14-cv-1423 ECF No. 755 is **GRANTED**.

**IT IS FURTHER ORDERED** that defendant Sherwin-Williams' motion for summary judgment at 07-cv-0864 ECF No. 431, 11-cv-0055 at ECF No. 1082, 11-cv-0425 ECF No. 274, and 14-cv-1423 ECF No. 760 is **GRANTED**.

**IT IS FURTHER ORDERED** that defendant Du Pont's motion for joinder at 07-cv-0864 ECF No. 434, 11-cv-0055 at ECF No. 1086, 11-cv-0425 ECF No. 277, and 14-cv-1423 ECF No. 763 is **GRANTED**.

**IT IS FURTHER ORDERED** that defendant Armstrong's motion for joinder at 07-cv-0864 ECF No. 437 is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiffs' motion to strike Sherwin-Williams' supplemental reports in the Second Wave cases at 11-cv-0055 ECF No. 1071 and 14-cv-1423 ECF No. 748 is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that defendant Sherwin-Williams' motion for reconsideration of the court's exclusion of defense expert John Goldberg at 11-cv-0055 ECF No. 1075 and 14-cv-1423 ECF No. 753 is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that defendant Atlantic Richfield's motion for summary judgment at 11-cv-0055 ECF No. 1078 is **GRANTED**.

**IT IS FURTHER ORDERED** that defendant Sherman-Williams' motion for judicial notice at 07-cv-864 ECF No. 459, 11-cv-0055 ECF No. 1112, 11-cv-0425 ECF No. 303, and 14-cv-1423 ECF No. 786 is **DENIED AS MOOT**.

35

The Clerk of Court is directed to enter judgment in favor of the defendants in all cases.

Dated at Milwaukee, Wisconsin, this 2nd day of March, 2022.

s/Lynn Adelman
LYNN ADELMAN
United States District Judge